[No. D041376. Fourth Dist., Div. One. Oct. 23, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
NICHOLAS J. ESAYIAN, Defendant and Appellant.

COUNSEL

Advocate Legal Services and Ronald A. Jackson for Defendant and Appellant.

Mary Frances Prevost as Amicus Curiae on behalf of Defendant and Appellant.

Bonnie M. Dumanis, District Attorney, Kim-Thoa Hoang and Richard S. Armstrong, Deputy District Attorneys, for Plaintiff and Respondent.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Lilia E. Garcia and Gary W. Brozio, Deputy Attorneys General, as Amicus Curiae on behalf of Plaintiff and Respondent.

Casey Gwinn, City Attorney, Susan M. Heath, Assistant City Attorney and Danielle Davidian, Deputy City Attorney as Amicus Curiae on behalf of Plaintiff and Respondent.

## OPINION

**HUFFMAN, Acting P. J.**—Nicholas J. Esayian was arrested for driving under the influence of alcohol and, in accordance with the implied consent law (Veh. Code,[1] §§ 23612, subd. (a) & 13384), he submitted to a blood test to determine his blood-alcohol content (BAC). Esayian was charged with driving under the influence of alcohol (DUI) as a misdemeanor. In the trial court Esayian moved to suppress the evidence of the blood test on the ground that the phlebotomist who drew his blood was not authorized under the appropriate statute to draw blood for that purpose. Accordingly, Esayian argued that the use of the blood and the results of any test of the blood would violate his constitutional rights under the Fourth and Fourteenth Amendments to the federal Constitution. The trial court denied the motion to suppress. Thereafter Esayian was convicted by a jury of one of the charges then pending against him.

Esayian appealed his conviction to the appellate division of the superior court (Appellate Division). That court affirmed his conviction, finding no error in the denial of Esayian's motion to suppress evidence or in the jury trial. The Appellate Division thereafter granted Esayian's request to certify the following questions for determination by this court: (1) whether the trial court erred in denying the suppression motion because the phlebotomist who drew the blood did not meet the requirements of section 23158; and (2) whether it violated Esayian's Fourteenth Amendment right to a fair trial for the prosecution to use the evidence obtained in violation of the statutory scheme to prove an essential element of the charged offense.

We transferred the matter to this court and requested the parties brief a third issue of whether the evidence in this case establishes that County of San Diego (County) law enforcement agencies have a deliberate, systematic and persistent policy to have blood drawn in violation of the statutory scheme. We have also permitted the filing of various amicus curiae briefs and have heard oral argument in the matter. After a review of the record and consideration of the briefing, we are convinced the record before us does not establish a systematic and persistent policy by the County to violate the statutory scheme for drawing blood in this type of case. We are also satisfied that Esayian's blood was not drawn in violation of the Fourth Amendment and that Esayian's right

---

[1] All further statutory references are to the Vehicle Code unless otherwise specified.

to a fair trial was not violated by the introduction of blood test results where the blood draw did not comply with California's regulatory scheme. Accordingly we will affirm the judgment of the superior court.

## FACTUAL BACKGROUND

Deputy Sheriff Charles Morreale stopped Esayian for speeding and subsequently arrested him for DUI. Esayian was given the choice of a blood, breath or urine test to determine his BAC. He elected to submit to a blood test. Deputy Morreale took Esayian to the Vista Detention Facility where, pursuant to a contract between the County and American Forensic Nurses, phlebotomist Sally Garcia drew Esayian's blood. The blood test results showed that Esayian's BAC was 0.12 percent. Esayian was charged with misdemeanor counts of driving under the influence of alcohol (count 1) and driving with a BAC of 0.08 percent or greater (count 2).

Prior to trial, Esayian moved to suppress the blood test results on the grounds that Garcia was not authorized to draw blood in DUI cases pursuant to section 23158.

At the pretrial hearing Deputy Morreale testified he arrested Esayian for DUI. Esayian elected to take a blood test. Deputy Morreale was aware that a phlebotomist would be on duty at the Vista Detention Facility and that there was also a breath testing machine at that location in the event Esayian changed his mind as to which chemical test he would choose. Morreale took Esayian to the Vista facility where he observed phlebotomist Sally Garcia draw blood from Esayian. Morreale had observed blood draws for DUI cases on a number of occasions. He did not observe anything unusual about this particular blood draw.

Morreale testified he observed Garcia cleanse the area from which the blood was drawn with a nonalcoholic swab. Deputy Morreale did not know the requirements of California Code of Regulations, title 17, section 1219.1 (Title 17).

Esayian testified that upon his arrest he elected to take a blood test. He did not discuss the qualifications of the phlebotomist with either Deputy Morreale or Ms. Garcia. Esayian believed Ms. Garcia swabbed his arm before drawing the blood. After the test she put cotton gauze and a Band-aid over the puncture. After the process was completed Esayian noted a small trickle of blood. Ms. Garcia gave Esayian a piece of cotton, which he used to clean off the blood. The blood draw procedure took 12 to 15 seconds. Esayian testified that the procedure used by Ms. Garcia did not differ from other times he had given blood samples.

Sally Garcia testified she was employed at the Vista Detention Facility on the date of Esayian's blood draw. She did not remember the details of the specific draw on that date. Ms. Garcia was working for American Forensic Nurses at the Vista facility. A registered nurse was on duty at the time. The nurse would check the suspect's vital signs, but would not necessarily be present when the blood draw took place.

At the time of her testimony at the suppression hearing, Ms. Garcia was employed as a medical assistant for Cassidy Medical Group. Most of her duties at the Cassidy Group generally involved back office responsibilities. She had received six months' training at the Simi Valley Adult School in conducting venipuncture blood draws, although the course was designed for training medical assistants. She is not certified by the State of California. In her medical career she had performed over 200 blood draws. She did not know the requirements of Title 17.

Ms. Garcia worked for American Forensic Nurses for two years and had performed about 100 blood draws relating to driving under the influence cases.

In her usual procedure to draw blood she would wait for the nurse to check the suspect's vital signs. Then Ms. Garcia would use a tourniquet. She did not recall using a swab on the occasion of Esayian's blood draw. If she had she would not have used alcohol or betadine. She would use a handiwipe supplied by American Forensic Nurses. She conducts blood draws at the Vista facility in the same manner as she does while working as a medical technician. She only draws venous blood from the suspect.

Garcia recalled no complications from the procedure. She then testified about the process of collecting and storing the sample.[2]

## DISCUSSION

### I

### *DELIBERATE AND SYSTEMATIC VIOLATION OF STATUTE*

As we have indicated, we requested that the parties and the amici curiae brief the question of whether the record demonstrated a systematic, deliberate and persistent violation of the statutory scheme regarding blood draws in

---

[2] The sample preservation and testing process was vigorously contested at the motion hearing and at trial. The issues before us in this proceeding however, do not require our consideration of such evidence. Accordingly, we have omitted discussion of the details of such testimony.

DUI cases. After careful review of the record, including those matters judicially noticed by the court, we conclude this record does not support a finding of systematic, deliberate and persistent violation of the statutes by the County.

We have reviewed the amicus curiae briefs presented in this case. Amicus curiae on behalf of Esayian cites to the record in another appellate proceeding (*Ridener v. Superior Court* (May 15, 2003, D041984)), which includes evidence that although the contract between the County and American Forensic Nurses requires blood draws be conducted by qualified personnel, few if any of American Forensic Nurses' phlebotomists are so qualified and that the County is and has been well aware of this fact. The evidence in that record also suggests that American Forensic Nurses' phlebotomists do not maintain their equipment in a medically accepted manner. However, although the file and briefs in that case are proper subjects for judicial notice, the truth of the content of those materials is not. (*Mangini v. R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1062 [31 Cal.Rptr.2d 358, 875 P.2d 73]; see also *People v. Woodell* (1998) 17 Cal.4th 448, 455 [71 Cal.Rptr.2d 241, 950 P.2d 85].) Thus Esayian and amicus curiae on his behalf cannot rely on such evidence to establish that County law enforcement agencies have a deliberate, systematic and persistent policy of having blood drawn in violation of the statutory scheme.

II

*THE BLOOD DRAW IN THIS CASE DID NOT VIOLATE THE FOURTH AMENDMENT*

Esayian contends the trial court erred in denying his motion to suppress evidence under Penal Code section 1538.5. His principal argument is that the blood draw in this case did not comply with the statutory rules governing the drawing of blood in DUI cases and therefore the blood was taken in violation of the Fourth Amendment. During oral argument a separate issue was raised regarding the blood draw in this case. It was argued that under *Schmerber v. California* (1966) 384 U.S. 757 [16 L.Ed.2d 908, 86 S.Ct. 1826] (*Schmerber*), the prosecution must affirmatively show that the blood was drawn in a medically approved manner. Given that burden of proof, the argument continued that there was no evidence in this case to meet that burden of proof since Garcia was not an approved phlebotomist under the statute and no other medical person testified. We will reject both arguments.

As we will explain in the discussion that follows, the drawing of blood in a DUI case by a phlebotomist who does not qualify under section 23158, subdivision (a) does not amount to a violation of the Fourth Amendment, nor does such violation support exclusion of the blood test evidence

under either the California or federal Constitutions. As to the proof of the manner of drawing the blood, the record in this case is sufficient to show that the draw was made by a person trained in venipuncture and done in the same manner as blood is regularly drawn in ordinary blood tests. Thus we are satisfied the blood was drawn in compliance with the directives of *Schmerber*.

### A. Statutory Violation

Although the trial judge at the Penal Code section 1538.5 motion found Garcia's training and experience almost satisfied Business and Professions Code section 1246, subdivisions (a) through (b), the District Attorney and the amicus Attorney General concede the taking of blood in this case violated the literal requirements of section 23158, subdivision (a). We accept those concessions on this record and proceed to analyze Esayian's contentions based on the assumption Garcia's actions did not comply with statutory requirements.

Before we examine the merits of this contention we set forth the appropriate standard of review. ■ On appeal from a denial of a motion to suppress evidence on Fourth Amendment grounds we review the historical facts as determined by the trial court under the familiar substantial evidence standard of review. Once the historical facts underlying the motion have been determined, we review those facts and apply the de novo standard of review in determining their consequences. Although we give deference to the trial court's factual determinations we independently decide the legal effect of such determinations. (*People v. Leyba* (1981) 29 Cal.3d 591, 596–597 [174 Cal.Rptr. 867, 629 P.2d 961].)

Esayian's contention that a violation of the statutory requirements for the manner of drawing blood in DUI cases does not raise any factual questions in this case. The effect of such violations is a question of law for this court to independently decide. In making that determination we are guided by recent case law from the Supreme Court.

In *People v. McKay* (2002) 27 Cal.4th 601 [117 Cal.Rptr.2d 236, 41 P.3d 59] (*McKay*), the court addressed the question of whether an arrest made in violation of a Vehicle Code section would require suppression of the evidence obtained during that arrest. Relying on the case of *Atwater v. City of Lago Vista* (2001) 532 U.S. 318 [149 L.Ed.2d 549, 121 S.Ct. 1536], our Supreme Court held that violation of a statute does not render an arrest unreasonable within the Fourth Amendment and that such statutory violations cannot serve as the basis for the application of the exclusionary rule. (*McKay, supra*, 27 Cal.4th at pp. 622–624.)

In *People v. Ford* (1998) 4 Cal.App.4th 32 [5 Cal.Rptr.2d 189] (*Ford*), the court dealt with a challenge to the drawing of blood in violation of the same statutory scheme as before us in which the defendant argued the taking of the blood without informed consent violated the statute and such violation compelled exclusion of the evidence taken. The court in *Ford* examined the requirements of *Schmerber, supra,* 384 U.S. 757, in the context of a claimed statutory violation. The court declined to decide whether the lack of informed consent violated the statute. Rather the court in *Ford* held the question under *Schmerber* was whether "the manner in which the sample was obtained" rendered the procedure constitutionally impermissible. (*Ford, supra,* 4 Cal.App.4th at p. 37; see also *Ove v. Gwinn* (9th Cir. 2001) 264 F.3d 817, 824.) (*Ford* has been cited with approval in *People v. Sugarman* (2002) 96 Cal.App.4th 210, 216 [116 Cal.Rptr.2d 689].)

We believe that the reasoning of *McKay, supra,* 27 Cal.4th 601, and *Ford, supra,* 4 Cal.App.4th 32, require rejection of Esayian's contention in this case. ■ The mere fact that the phlebotomist may not have fully complied with the statutory requirements of section 23158, subdivision (a) does not create a Fourth Amendment violation. There may be other remedies available to challenge governmental activity in violation of statutes and regulations. However, such violations, without more, do not render a search or seizure unreasonable within the meaning of the Fourth Amendment.

## B. The Manner of Drawing the Blood

As we have noted, the discussions at oral argument raised the questions of whether *Schmerber, supra,* 384 U.S. 757, required proof that the blood was drawn in a "medically approved manner" and if so, whether the prosecution met its burden in this case. Specifically, it is argued that the burden cannot be met because Garcia was not "approved" under the statute and did not know the requirements of Title 17. Thus, the argument continues there needs to be some expert testimony that the blood was properly drawn. We believe this record has sufficient evidence to show the blood was drawn in a constitutionally permissible manner.

In *Schmerber, supra,* 384 U.S. 757, the court addressed a number of constitutional issues regarding the drawing of blood from an arrested person without the person's consent. The court noted that the "overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." (*Id.* at p. 767.) The court there found that drawing blood for a blood test was reasonable when supported by probable cause and exigent circumstances, which made it unnecessary for police to obtain a warrant. The court noted that a physician in a hospital setting drew Schmerber's blood, with appropriate precautions taken. It found that for most

people blood tests involve "virtually no risk, trauma or pain." (*Id.* at p. 771.) While the court went on to express some doubts about blood being drawn in the private setting of the police station, it did not attempt to set any specific rules for blood tests conducted outside the hospital setting.

In *Winston v. Lee* (1985) 470 U.S. 753 [84 L.Ed.2d 662, 105 S.Ct. 1611], the court revisited the issue of taking evidence from the body of a suspect by means of surgical intrusions beneath the skin. It found that the reasonableness of such intrusions depended upon a weighing of the societal interest in obtaining the evidence as against the individual's privacy rights and the risks of pain or harm posed by such procedures. By way of example, the court cited the blood test in *Schmerber, supra,* 384 U.S. 757, as a type of test which is highly effective, produces valuable probative evidence and poses little risk of harm, pain or indignity to the suspect. (*Winston, supra,* 470 U.S. at p. 762.) Certainly society has a great interest in the effective enforcement of the prohibitions against driving under the influence of drugs and alcohol. Blood tests are an accepted, safe method of reliably obtaining evidence in such cases. (*Ford, supra,* 4 Cal.App.4th at pp. 38–39.)

Applying the above principles to the facts of this case, we find the prosecution carried its burden to show the blood was drawn in a constitutionally permissible fashion. Clearly a blood draw is a medical procedure and must be conducted in keeping with medical requirements for such procedure. The Vehicle Code creates a statutory scheme for such draws, but noncompliance with the statute does not, by itself, demonstrate the methods used were improper.

The trial court in this case could reasonably find that Garcia had undergone appropriate training in venipuncture. She was employed at a medical clinic and had done about 200 blood draws in her "medical career."[3] She testified that the blood draw in this case was done in the same manner as all the other blood draws she had performed. Moreover, the record, viewed in the light most favorable to the trial court's decision, supports her statement. Garcia used a tourniquet, swabbed the area from which blood would be drawn with a nonalcoholic swab (the testimony of Morreale and Esayian) and withdrew the blood with a sterile needle. After the draw she covered the puncture with cotton gauze and a Band-aid. Esayian testified the blood draw was done in the same fashion as other blood tests he had experienced in the past. Morreale gave similar testimony.

The manner in which the blood was drawn in this case matches the manner in which the blood was drawn by a licensed technician in *Ford, supra,* 4

---

[3] She also testified she had performed about 100 blood draws in DUI cases.

Cal.App.4th 32. There is nothing in this record to justify an inference that the manner of drawing the blood was unsanitary, or subjected the suspect to any unusual pain or indignity. It is undisputed the draw was supported by probable cause and done under exigent circumstances, i.e., that the alcohol in the blood would metabolize and thus could be drawn without a prior judicial authorization. (*Schmerber, supra*, 384 U.S. 757.) The trial court found the blood was properly drawn and nothing in the record compels a different conclusion. As curiae counsel for Esayian conceded at oral argument, the defense expert testimony in the trial court did not challenge the conduct of the blood draw, but rather challenged the manner of its collection and preservation, none of which raises a question as to the constitutional validity of the draw itself.

The only negative fact discussed at oral argument was the fact that Garcia did not know the requirements of Title 17. There is nothing in that fact, however, that detracts from the evidence that this draw was like the others she did in her medical career, as distinguished from her work for American Forensic Nurses. Title 17 does not address Garcia's work at the clinic or her training in venipuncture. It was not necessary in this case for the prosecution to produce (without request or objection from the defense) a separate "medical expert" in order to meet its burden of proving compliance with the Fourth Amendment.

The trial court properly denied the motion to suppress evidence.

### III

### *DUE PROCESS*

Finally, Esayian contends that the introduction of the blood test results at trial violated his right to due process. He argues that admitting evidence of a blood test where the blood was taken in violation of the statutory scheme is fundamentally unfair. We do not find a violation of Esayian's due process rights.

Esayian was represented by counsel at trial. He had full access to the prosecution's evidence and had the opportunity to fully challenge the government's case. Esayian not only moved to suppress the blood test evidence before trial, he mounted a vigorous attack on the credibility of that evidence at trial. Esayian presented expert witness testimony to criticize the manner in which his blood sample was stored, preserved and processed. His expert sharply challenged the test results.

Esayian's evidence was countered at trial by an expert presented by the prosecution. At the end of the process, the jury believed the prosecution's

case and convicted Esayian. He does not challenge the sufficiency of the evidence. He simply argues that tests taken in violation of statute violate due process.

■ A person seeking to overturn a conviction on due process grounds bears a heavy burden to show the procedures used at trial were not simply violations of some rule, but are fundamentally unfair. (*Montana v. Egelhoff* (1996) 518 U.S. 37, 43–44 [135 L.Ed.2d 361, 116 S.Ct. 2013].) Ordinarily, even erroneous admission of evidence does not offend due process unless it is so prejudicial as to render the proceeding fundamentally unfair. (*People v. Falsetta* (1999) 21 Cal.4th 903, 913 [89 Cal.Rptr.2d 847, 986 P.2d 182]; *Estelle v. McGuire* (1991) 502 U.S. 62, 70 [116 L.Ed.2d 385, 112 S.Ct. 475].)

It appears from a review of the settled statement and the discussions at oral argument that Esayian did not challenge the manner of the blood draw at trial. His expert focused on other issues, and was not successful in raising a reasonable doubt regarding the prosecution's case. Esayian did not raise a due process claim in the trial court. Neither the prosecution nor the court had the opportunity to address the constitutional issue presented here. ■ Failure to raise a constitutional issue at trial constitutes a waiver of the issue on appeal. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1082 [119 Cal.Rptr.2d 859, 46 P.3d 335].) Given the nature of this record, however, even if we did not treat this issue as waived, there is nothing in the case before us to demonstrate that admission of evidence taken in violation of a statute violates the principles of due process.

## DISPOSITION

The judgment is affirmed.

O'Rourke, J., concurred.

**McINTYRE, J.,** Concurring and Dissenting.—I concur in the majority opinion to the extent it holds that the record properly before us does not demonstrate that the County of San Diego (County) has a deliberate, systematic and pervasive policy of having blood draws conducted in violation of statutory requirements. I dissent, however, from the majority's conclusion that the blood draw in this case does not violate the Fourth Amendment. Because I find that the prosecution did not meet its burden to show that the blood draw was constitutionally reasonable in this case, I do not reach the issue of whether the introduction of the blood test results at trial violated Esayian's due process rights.

Pursuant to state law, only specified persons may draw blood for the purpose of determining its alcohol content (BAC). (Veh. Code, § 23158,

subd. (a) (all further statutory references are to the Vehicle Code unless otherwise specified); Cal. Code Regs., tit. 17, § 1219.1, subd. (a) [referring to former § 13354, now § 23158].) Persons authorized to conduct the procedure include licensed physicians or surgeons, registered nurses, licensed vocational nurses, certain licensed clinical personnel or certified paramedics acting at the request of a peace officer. (§ 23158, subd. (a).) In addition, certain unlicensed laboratory personnel are authorized to conduct such blood draws, provided certain statutory requirements are met. (*Ibid.*) As relevant here, an unlicensed person is qualified to perform such a procedure (1) at the direction of a peace officer, if (2) he or she (a) is properly trained, (b) is employed by a licensed clinical laboratory, and (c) works under the supervision of a physician or other licensed person who is "physically available to be summoned to the scene of the venipuncture within five minutes during the performance of those procedures." (Bus. & Prof. Code, § 1246, subds. (a)–(b); § 23158, subd. (a).)

A person authorized by statute to draw blood samples for purposes of blood-alcohol testing is required to comply with regulatory standards applicable to such blood draws, as set forth in California Code of Regulations, title 17, sections 1219 and 1219.1. Those regulations set forth certain minimum standards for blood draws, including the use of nonalcohol or other volatile organic disinfectants for the draw site and of sterile, dry hypodermic needles and syringes or clean, dry vacuum-type containers with sterile needles. (Cal. Code Regs., tit. 17, § 1219.1, subds. (c), (d).)

It is undisputed here that Garcia did not meet the requirements of section 23158 and thus was not qualified under state law to draw blood samples for BAC testing. It is also undisputed that she was not trained in or aware of the minimum standards set forth in the regulations governing such a blood draw and that she performed the blood draw in a nonmedical facility. The threshold question presented in this case is whether—in light of Garcia's lack of qualifications to draw Esayian's blood, her lack of training and knowledge of the regulations, and the setting in which she drew the blood—the prosecution met its burden to show the reasonableness of the blood draw as required under the Fourth Amendment. I conclude that it did not.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures" by police officers and other government officials. (U.S. Const., 4th Amend.) By virtue of the due process clause of the Fourteenth Amendment to the federal Constitution, this guarantee is applicable to the states. (See *Mapp v. Ohio* (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 86 OhioLawAbs. 513].) A similar guarantee against unreasonable government searches is set forth in the state Constitution (Cal. Const., art. I, § 13), but since voter

approval of Proposition 8 in June 1982, state and federal claims relating to exclusion of evidence on grounds of unreasonable search and seizure are measured by the same standard. (*People v. Camacho* (2000) 23 Cal.4th 824, 829–830 [98 Cal.Rptr.2d 232, 3 P.3d 878].) "Our state Constitution . . . forbids the courts to order the exclusion of evidence at trial as a remedy for an unreasonable search and seizure unless that remedy is required by the federal Constitution as interpreted by the United States Supreme Court. [Citation.]" (*Id.* at p. 830; see *People v. McKay* (2002) 27 Cal.4th 601, 608 [117 Cal.Rptr.2d 236, 41 P.3d 59] [evidence taken in violation of state statutory or constitutional provisions is not subject to exclusion unless its taking also violates federal constitutional standards].) However, if federal Fourth Amendment standards are violated, the evidence so obtained is subject to the exclusionary rule.

A person may consent to a warrantless search of his person or property, and in accordance with the state implied consent law, all drivers of motor vehicles are deemed to have consented to a blood, breath or urine blood-alcohol test when lawfully arrested for driving under the influence. (§ 23612; *Zink v. Gourley* (2000) 77 Cal.App.4th 774, 778, fn. 2 [91 Cal.Rptr.2d 896].) Such implied consent assumes, however, that authorized personnel will conduct the test in an authorized manner. No such consent can be assumed where, as here, the person administering the procedure is not authorized or qualified to do so and is untrained in the minimum standards for the procedure as specified by law. (See *People v. Ford* (1992) 4 Cal.App.4th 32, 36 [5 Cal.Rptr.2d 189] (*Ford*); *Ross v. Department of Motor Vehicles* (1990) 219 Cal.App.3d 398 [268 Cal.Rptr. 102] [driver's insistence on seeing documentation establishing that the person drawing his blood is licensed to do so before submitting to a blood draw does not constitute a refusal to submit to the test].)

Of course, the absence of consent does not establish a federal constitutional violation. In *Schmerber v. California* (1966) 384 U.S. 757 [16 L.Ed.2d 908, 86 S.Ct. 1826] (*Schmerber*), the United States Supreme Court concluded that a driver arrested for driving under the influence of alcohol may be required to submit to a blood test without his consent provided that the procedure (1) is incident to a lawful arrest, (2) is based on a reasonable belief that the driver is intoxicated, and (3) meets relevant Fourth Amendment standards of reasonableness. (See also *People v. Sugarman* (2002) 96 Cal.App.4th 210, 214 [116 Cal.Rptr.2d 689]; *Ove v. Gwinn* (9th Cir. 2001) 264 F.3d 817, 824.) Where, as here, the defendant challenges the reasonableness of the search, the prosecution bears the burden of showing that the search was reasonable. (See *Schmerber, supra*, 384 U.S. at pp. 771–772; *People v. Williams* (1999) 20 Cal.4th 119, 130 [83 Cal.Rptr.2d 275, 973 P.2d 52].)

What is reasonable " 'depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself,' " and the permissibility of the search is " 'judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.' " (*Skinner v. Railway Executives' Assn.* (1989) 489 U.S. 602, 619 [103 L.Ed.2d 639, 109 S.Ct. 1402].) "[T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." (*Bell v. Wolfish* (1979) 441 U.S. 520, 559 [60 L.Ed.2d 447, 99 S.Ct. 1861].)

It is well established that the government has a significant interest in obtaining blood test evidence to determine whether a driver was under the influence of alcohol. (*Schmerber, supra*, 384 U.S. at p. 771.) As recognized in *Schmerber*, blood tests are "a highly effective means of determining the degree to which a person is under the influence of alcohol," and a blood test carries with it a high probability that evidence of guilt will be found. (*Id.* at pp. 770–771.) However, even recognizing the government's significant interest in the evidence, the central question remains whether the means by which the police obtained that evidence otherwise created an unreasonable intrusion to the driver's Fourth Amendment interests.

Where the search involves a surgical intrusion beneath the skin, its reasonableness depends in part on "the extent to which the procedure may threaten the safety or health of the individual." (*Winston v. Lee* (1985) 470 U.S. 753, 761–762 [84 L.Ed.2d 662, 105 S.Ct. 1611].) Thus, although the intrusion into one's physical person is generally deemed to involve a significant intrusion on his dignitary interests in personal privacy and bodily integrity (*Schmerber, supra*, 384 U.S. 757; *Cupp v. Murphy* (1973) 412 U.S. 291, 295 [36 L.Ed.2d 900, 93 S.Ct. 2000] [fingernail scrapings]), it is widely accepted that the intrusiveness of a blood draw conducted by qualified personnel in an appropriate manner is not so substantial as to require exclusion of the evidence obtained thereby. (*Schmerber, supra*, 384 U.S. at p. 771; *Hedges v. Musco* (3d Cir. 1999) 204 F.3d 109, 120; *U.S. v. Bullock* (5th Cir. 1995) 71 F.3d 171, 176.)

In *Schmerber*, the U.S. Supreme Court concluded that the taking of a blood sample "by a physician in a hospital environment according to accepted medical practices" was constitutionally reasonable. In finding reasonableness, the high court noted "[w]e are thus not presented with the serious questions which would arise if a search involving use of a medical technique, even of

the most rudimentary sort, were made by other than medical personnel or in other than a medical environment—for example, if it were administered by police in the privacy of the stationhouse. To tolerate searches under these conditions might be to invite an unjustified element of personal risk of infection and pain." (*Schmerber, supra*, 384 U.S. at pp. 771–772.) The court reiterated that its determination of the constitutionality of "minor intrusions into an individual's body under stringently limited conditions in no way indicates that [the Constitution] permits more substantial intrusions, or intrusions under other conditions." (*Id.* at p. 772.)

Here, the blood sample was taken in circumstances similar to those that concerned the *Schmerber* court. Garcia drew Esayian's blood at the Vista Detention Center rather than in a hospital or other medical facility, and she was not qualified to do so pursuant to statutes and regulations enacted or promulgated after the issuance of the *Schmerber* decision. (Stats. 1966, 1st Ex. Sess. 1966, ch. 138, §§1–2, pp. 634–637.) Further, Garcia was completely unfamiliar with the regulatory standards for conducting such a blood draw. Although the prosecutor introduced evidence as to the steps Garcia followed in taking Esayian's blood, the evidence adduced at trial did not establish the applicable medical standards for such a procedure. In addition, the prosecutor did not present any evidence as to the safety and sanitation conditions at the detention facility and whether those conditions would comply with the standards applicable to medical facilities. Thus, the prosecutor did not meet his burden of proof to establish the reasonableness of the blood draw for Fourth Amendment purposes. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 972 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; see also *United States v. Matlock* (1974) 415 U.S. 164, 171, 177 [39 L.Ed.2d 242, 94 S.Ct. 988].)

The intrusion into personal privacy of an individual whose blood is being drawn is much greater where the person drawing the blood lacks the qualifications expressly required by law and the knowledge of the applicable standards for conducting such a procedure. Consequently, there is no assurance that the person is familiar, and will comply, with medically accepted standards for the procedure. The fact that the procedure is conducted in a nonmedical facility adds to the risk, and thus the magnitude of the intrusion, absent a showing that the safety and sanitation standards maintained at the detention facility are similar to those that are required for medical facilities. In addition, there is an increased risk from the lack of personnel available to respond in the event of a problem. (Here, although Garcia testified that a nurse was present at the facility at the time she conducted the blood draw, she was uncertain about whether the nurse was a registered nurse and that, in any event, the nurse was not physically present during the blood draw.)

I acknowledge that another California court has reached the opposite conclusion on similar facts. (*Ford, supra*, 4 Cal.App.4th at pp. 35–40).) In

*Ford*, the appellate court held that the taking of blood by a phlebotomist, in a nonmedical setting, for alcohol testing purposes did not violate the Fourth Amendment and thus the resulting blood test evidence was not subject to exclusion at trial. (*Id.* at pp. 36–38.) In reaching this conclusion, the court observed that the phlebotomist used "a standard procedure and materials he obtained from a local hospital" and certified that he withdrew the blood sample in a medically approved manner. (*Id.* at p. 37.) Based on these circumstances, and the fact that the defendant's medical experts "did not take exception" to the manner in which the sample was collected, the court held that the intrusiveness of the blood draw was not constitutionally unreasonable in light of the community's interest in prosecuting driving under the influence cases. (*Ibid.*)

The circumstances of this case are distinguishable from those involved in *Ford*. Here the evidence establishes that Garcia was not only statutorily unqualified to conduct the blood draw, but was also not trained in conducting blood draws for purposes of determining a driver's BAC and did not know what the regulatory standards applicable to such a procedure required. Unlike the phlebotomist in *Ford*, Garcia did not, and in fact could not, opine that she drew Esayian's blood in a medically acceptable manner. The testimony of Esayian and Morales likewise failed to establish that this *Schmerber* requirement was met. Thus, although the court concluded that the prosecutor made a sufficient showing of the reasonableness of the search in *Ford*, it did so based on substantially different evidence than that presented by the prosecution in this case.

The United States Supreme Court has explained that the exclusionary rule is a judicially created remedy designed to deter law enforcement misconduct by prohibiting the admission of evidence obtained in violation of the Fourth Amendment. (*Arizona v. Evans* (1995) 514 U.S. 1, 10 [131 L.Ed.2d 34, 115 S.Ct. 1185].) The purpose of the rule is not to cure the constitutional violation, which is already fully accomplished by the illegal search itself, but instead to effectuate the Fourth Amendment's guarantee against unreasonable searches or seizures by deterring future unlawful police conduct. (*Ibid.*) Based on this purpose, the application of the rule is restricted to situations in which the rule's remedial purpose is "effectively advanced," which in turn depends on "the source of the error or misconduct that led to the unconstitutional search and whether, in light of that source, the deterrent effect of exclusion is sufficient to warrant that sanction." (*People v. Willis* (2002) 28 Cal.4th 22, 29–30, 35 [120 Cal.Rptr.2d 105, 46 P.3d 898].)

I believe that the application of the exclusionary rule is appropriate in a situation such as this—where the County's uses an unqualified and untrained personnel to draw blood from a driver in a nonmedical setting. Although the

evidence in the record is not sufficient to establish that the County has a deliberate, persistent and systematic policy of failing to comply with the applicable minimum standards for blood draws, I nonetheless conclude that the exclusion of the evidence in this case will deter the repetition of this situation, which, as discussed above, creates an undue risk to the safety and health of the drivers.

For these reasons, I conclude that the trial court erred in concluding that the prosecution met its burden to show that the blood draw was conducted in a constitutionally reasonable manner and denying Esayian's motion to suppress the BAC evidence that resulted from the blood draw. Because no other evidence of Esayian's BAC was introduced at trial, I would reverse the conviction for driving with an excessive BAC.

A petition for a rehearing was denied November 12, 2003.