[No. D042148. Fourth Dist., Div. One. June 7, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
STEPHEN McHUGH, Defendant and Appellant.

**COUNSEL**

Gary E. Nelson for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Gary W. Schons, Assistant Attorneys General, Lilia E. Garcia and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**McDONALD, J.**—Stephen McHugh pleaded guilty to a series of charges after the court denied his motion to suppress evidence of the results of his blood-alcohol test.[1] On appeal, McHugh asserts this evidence should have been suppressed because it was obtained as a result of an improper stop, and the blood draw was improper.

I

FACTUAL BACKGROUND[2]

A. *The Arrest*

At approximately 9:30 p.m. on April 30, 2002, Officer Rossi of the San Diego City Schools Police Department was driving home in the marked patrol car he used for his work.[3] As he drove northbound on Interstate 15, Rossi saw a car, driven by McHugh, speed past him on his right. The speeding car changed lanes and moved in front of him. Rossi regularly monitored traffic on his way home and issued tickets. Rossi knew McHugh was driving in excess of the posted speed limit, and paced McHugh's car to determine if he was driving excessively fast. Rossi determined McHugh was driving 90 miles per hour.

Rossi, who was driving to the rear of McHugh, flashed his bright lights to induce McHugh to slow to the speed limit, which he did not. Rossi turned on his siren and overhead lights, and used his spotlight to illuminate the interior of McHugh's car. McHugh adjusted his rearview mirror to deflect the light

---

[1] McHugh was charged with driving under the influence of drugs or alcohol (Veh. Code, § 23152, subd. (a), count one), driving while having .08 percent or more by weight of alcohol in his blood (§ 23152, subd. (b), count two), and evading an officer (§ 2800.1, subd. (b), count three). All further statutory references are to the Vehicle Code unless otherwise specified. The information specially alleged that within seven years of the commission of the offenses charged in counts one and two, McHugh had been convicted of three separate driving-under-the-influence violations, thereby raising the offenses charged in counts one and two to the status of felonies within the meaning of sections 23626 and 23550, subdivision (a). McHugh pleaded guilty to all three counts and admitted as true the three charged prior convictions.

[2] We review the facts in the light most favorable to the trial court's disposition of the suppression motion. (*People v. Woods* (1999) 21 Cal.4th 668, 673 [88 Cal.Rptr.2d 88, 981 P.2d 1019].)

[3] Rossi's patrol car was a black-and-white vehicle with red and blue lights on the roof and the San Diego City Schools Police Department insignia on its side.

from his face and slowed to 70 miles per hour; he did not pull over. Rossi radioed for a California Highway Patrol or San Diego Police Department unit in the area to assist him.

McHugh did not respond to Rossi's siren and continued driving approximately one and one-half miles to the Poway Road exit. McHugh drove onto Poway Road and accelerated to approximately 85 miles per hour with Rossi in pursuit. When McHugh reached the stop light at Sabre Springs Road, he stopped in the left turn lane for the red traffic light. Because Rossi was concerned McHugh might try to run the light in an attempt to further evade him, he pulled his car in front of McHugh's car to block its further movement. Rossi got out of his patrol car, and approached McHugh's car with his revolver drawn and pointed at McHugh. Rossi instructed McHugh to put his hands up and to hand over his keys, and McHugh asked Rossi which command he should comply with first. Rossi was embarrassed that he asked McHugh to do both things at once, and said, "Well, give me your keys," with which McHugh complied. During this exchange, Rossi reholstered his revolver.

Rossi instructed McHugh to get out of the car, handcuffed him and detained him inside Rossi's patrol car. Rossi detected a strong odor of alcohol near McHugh; noticed he had glassy eyes, a slack-jawed expression and slurred speech; and concluded he had been driving while intoxicated. Rossi placed McHugh under arrest for that offense and transported him to police headquarters for booking.[4]

B. *The Blood Draw*

Rossi escorted McHugh to room 138, a laboratory room at police headquarters, which contained two breathalyzer machines and a chair near a table for drawing blood samples. Rossi told McHugh he must submit to either a blood or breathalyzer test to determine his blood-alcohol level, and McHugh told Rossi he refused to submit to either a blood or breathalyzer test. Rossi read a form admonishment informing McHugh of the legal ramifications of refusing to take a blood-alcohol test, and told McHugh his blood would be drawn regardless of his refusal and it would better if McHugh did not fight. McHugh responded he would not fight but instead was merely refusing to consent to a blood draw or a chemical test.

---

[4] In response to Rossi's call for assistance, a patrol officer and a lieutenant from the San Diego Police Department arrived at the scene. They discussed what had occurred, and Rossi decided he would transport McHugh to headquarters for booking while the others impounded McHugh's car.

Rossi asked Ms. Dominguez, a certified phlebotomist,[5] to draw McHugh's blood. The parties stipulated Dominguez was not a person described by section 23158, subdivision (a) as authorized to draw blood for purposes of a blood-alcohol test. The parties also stipulated that, prior to McHugh's arrest, San Diego law enforcement agencies had been advised that use of phlebotomists to draw blood at San Diego police headquarters did not comply with section 23158 and the use of phlebotomists for this purpose continued, including McHugh's blood draw.

The blood-alcohol test measured McHugh's blood-alcohol level at 0.18 percent.

### C. *Defense Testimony*

McHugh testified that Rossi told McHugh he would have to submit to either a blood or urine test and did not mention the option of a breathalyzer test. McHugh told Rossi he did not think he could produce a urine sample within a short period of time, and he did not want to submit to a blood draw because of his bad experiences with needles and blood draws in the past. He asked to have a breathalyzer test, but Rossi refused his request and told him he must provide either a urine or blood test and a blood draw would be forced if necessary.

## II

## THE SUPPRESSION MOTION

McHugh moved to suppress the results of the blood-alcohol test. He asserted Rossi exceeded his authority when he stopped McHugh's car, and therefore the stop and subsequent arrest were unreasonable and required suppression of the fruits of the subsequent search. He also argued that the blood draw was an unreasonable search because he was denied the opportunity to submit to a breathalyzer test and because Dominguez was not a person statutorily authorized to draw blood for purposes of a blood-alcohol test.

The court found Rossi acted within his authority to stop McHugh's car because McHugh was driving in a reckless and dangerous manner and then compounded his dangerous conduct by trying to evade Rossi, resulting in a

---

[5] The State of California does not license phlebotomists. However, Dominguez's training included a 90-hour health care fundamentals course, a year-long medical lab assistant class that included a phlebotomist class and a 120-hour internship, and a four-month phlebotomist class that included both classroom instruction and a 90-hour internship. During her training she received instruction from doctors or clinical laboratory bioanalysts about phlebotomy and performed more than 10 venipunctures under their supervision.

high-speed chase. The court also concluded Rossi was more credible than McHugh, Rossi offered McHugh the choice between a breathalyzer or chemical test, and McHugh refused to take any test; and rejected McHugh's claim that he timely requested a breathalyzer test in lieu of the blood test. The court also concluded that although the police department may have known that using Dominguez to draw McHugh's blood violated a state statute, and using a phlebotomist was part of a systematic decision by San Diego law enforcement agencies to ignore the state statute, there was no Fourth Amendment violation because Dominguez conducted the blood draw according to approved medical procedures and McHugh suffered no detriment from the fact that Dominguez (rather than a nurse or physician) conducted the blood draw.

## III

## ANALYSIS

### A. *Standard of Review*

The standard of appellate review of a trial court's ruling on a motion to suppress evidence is well established. We defer to the trial court's factual findings, express or implied, if supported by substantial evidence, with all presumptions favoring the trial court's exercise of its power to judge the credibility of the witnesses, resolve conflicts in the testimony, weigh the evidence and draw factual inferences. (*People v. Weaver* (2001) 26 Cal.4th 876, 924 [111 Cal.Rptr.2d 2, 29 P.3d 103] ; *People v. Leyba* (1981) 29 Cal.3d 591, 596 [174 Cal.Rptr. 867, 629 P.2d 961].) However, in determining whether on the facts so found the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. (*People v. Glaser* (1995) 11 Cal.4th 354, 362 [45 Cal.Rptr.2d 425, 902 P.2d 729].)

### B. *The Stop and Arrest*

McHugh argues that Rossi, a peace officer with limited statutory powers to arrest citizens, exceeded his statutory authority by stopping McHugh for a mere speeding violation, and therefore the ensuing arrest and search were unreasonable under the Fourth Amendment and require suppression of the evidence. We conclude that, even assuming state statutory limitations on a peace officer's powers are relevant to a motion to suppress, Rossi did not exceed the powers granted to school peace officers.[6]

---

[6] Under Proposition 8, we are not free to exclude evidence merely because it was obtained in violation of a state statutory limitation on a peace officer's powers of arrest if the stop and arrest was otherwise reasonable under federal law. (*People v. McKay* (2002) 27 Cal.4th 601,

Rossi was employed as a member of a police department of a school district pursuant to Education Code section 38000. Penal Code section 830.32 describes the authority of school district police: "The following persons are peace officers whose authority extends to any place in the state for the purpose of . . . making an arrest pursuant to Section 836 as to any public offense with respect to which there is immediate danger to person or property, or of the escape of the perpetrator of that offense . . . . Those peace officers may carry firearms only if authorized and under terms and conditions specified by their employing agency. [¶] . . . [¶] (b) Persons employed as members of a police department of a school district pursuant to Section 38000 of the Education Code . . . ."

■ Under that provision, Rossi's power to effect an arrest extended to any place in the state, provided he had probable cause to believe McHugh had committed an offense in Rossi's presence (Pen. Code, § 836, subd. (a)(1)) that presented an immediate danger to person or property. Substantial evidence supports the trial court's findings that McHugh was driving in a reckless and dangerous manner when Rossi first observed him, and thereafter exacerbated the dangers presented by his reckless conduct in refusing to yield to Rossi and initiating a high speed chase on a well-traveled street that had cross-traffic. Driving at 90 miles per hour on an interstate freeway, and then reacting to an officer's attempt to stop him by leaving the freeway and accelerating to 85 miles per hour on a public street, is (in the trial court's words) "dangerous," "reckless," and "the kind of driving that allows no error whatsoever and can cause an accident simply by someone else's slight error." We conclude the public offense committed in Rossi's presence was one "with respect to which there is immediate danger to person or property," and *therefore Rossi acted within his authority to stop McHugh for that offense.*

■ McHugh alternatively asserts that in addition to Rossi's lack of authority to make any stop *ab initio*, the stop was an unreasonable detention because, even after McHugh complied with the red traffic light by stopping at the intersection, Rossi used his car to block the front of McHugh's car, leapt from his police car and pointed his revolver at McHugh. However, the stop and detention of McHugh were reasonable within the meaning of the Fourth Amendment because Rossi had specific articulable facts creating a reasonable suspicion that McHugh was involved in criminal activity.

608–615 [117 Cal.Rptr.2d 236, 41 P.3d 59].) "[S]o long as the officer has probable cause to believe that an individual has committed a criminal offense, a custodial arrest—even one effected in violation of state arrest procedures—does not violate the Fourth Amendment," even if the offense is a minor traffic violation. (*Id.* at p. 618.) The fact an officer makes an arrest for a traffic infraction beyond the boundaries of his or her territorial authority does not automatically violate state statutes if, as here, the arrestee is immediately taken to the police department in compliance with Penal Code section 847. (See *Lofthouse v. Department of Motor Vehicles* (1981) 124 Cal.App.3d 730, 735 [177 Cal.Rptr. 601].)

(*People v. Souza* (1994) 9 Cal.4th 224, 231 [36 Cal.Rptr.2d 569, 885 P.2d 982].) A police officer may use force, including blocking a vehicle and displaying his or her weapon, to accomplish an otherwise lawful stop or detention as long as the force used is reasonable under the circumstances to protect the officer or members of the public or to maintain the status quo. (*People v. Taylor* (1986) 178 Cal.App.3d 217, 228, fn. 7 [223 Cal.Rptr. 638]; *People v. Soun* (1995) 34 Cal.App.4th 1499, 1519 [40 Cal.Rptr.2d 822].) The trial court found McHugh's reckless driving and failure to yield created a reasonable fear that McHugh might resume his flight. Rossi displayed his weapon only for the limited amount of time necessary to obtain McHugh's car keys and ensure that McHugh's high-speed drive had ended. The force used was reasonable under the circumstances to protect Rossi's safety and to maintain the status quo.

## C. *The Blood Draw*

McHugh argues the blood draw was an unreasonable search because he expressed willingness to submit to a breathalyzer test. He alternatively argues the deliberate and systematic use of a phlebotomist to draw blood by San Diego law enforcement agencies in violation of section 23158 warrants suppression of the results of the blood-alcohol test.[7]

### *The Breathalyzer Issue*

McHugh first asserts *Schmerber v. California* (1966) 384 U.S. 757 [16 L.Ed.2d 908, 86 S.Ct. 1826], although holding a blood draw performed according to accepted medical procedures is not an unreasonable search, cautioned that a blood draw could be deemed unreasonable if the defendant was denied the option of a less intrusive breathalyzer test. (*Id.* at p. 771.) He argues his stated desire for a breathalyzer test was ignored and therefore the blood draw was unreasonable.

However, the trial court found Rossi *did* offer McHugh the option of either a blood or breathalyzer test, McHugh was aware of his options from his

---

[7] McHugh also argues the trial court erroneously refused to take judicial notice of the factual findings in another trial court proceeding in which the trial judge found that San Diego law enforcement agencies deliberately and systematically used phlebotomists to conduct blood draws knowing the practice violated section 23158. We need not decide whether the ruling on McHugh's request for judicial notice was error because the parties stipulated below that San Diego law enforcement agencies knew that using phlebotomists to conduct blood draws violated section 23158, and on appeal the Attorney General concedes the trial court was cognizant of the facts concerning the deliberate and systematic violation of section 23158 when it made its ruling. Our analysis presumes San Diego law enforcement agencies deliberately and systematically use phlebotomists in violation of section 23158.

prior DUI arrests, and he refused to consent to either test.[8] A person who refuses to comply with the breathalyzer test option may be required to submit to a blood draw, without violating the Fourth Amendment (*People v. Sugarman* (2002) 96 Cal.App.4th 210, 214–216 [116 Cal.Rptr.2d 689]), as long as there is probable cause to believe he was driving under the influence and the blood draw is performed in a reasonable, medically approved manner. (*People v. Ford* (1992) 4 Cal.App.4th 32, 35 [5 Cal.Rptr.2d 189].)

■ McHugh, relying on his own testimony that he told Rossi he had bad experiences with needles and therefore asked for a breathalyzer test but was never offered that option, argues the blood draw was unreasonable under *Schmerber*. However, the trial court was not required to credit that testimony, and instead found Rossi's contrary testimony highly credible. Moreover, the trial court found that *if* McHugh asked for a breathalyzer test, this request came *after* he refused to take either test and *after* Rossi told McHugh his blood would be drawn regardless of McHugh's refusal. The courts have consistently held that after a driver refuses to take any of the proffered chemical tests, he or she may not later retract the refusal to avoid the consequences of that refusal. (*Cole v. Department of Motor Vehicles* (1983) 139 Cal.App.3d 870, 873–874 [189 Cal.Rptr. 249]; *Dunlap v. Department of Motor Vehicles* (1984) 156 Cal.App.3d 279, 280–281 [202 Cal.Rptr. 729].) "[O]nce the suspect refuses to take one of the . . . tests, . . . there is no requirement that the officers thereafter give him a test when he decides he is ready." (*Skinner v. Sillas* (1976) 58 Cal.App.3d 591, 598 [130 Cal.Rptr. 91]; accord, *Morgan v. Department of Motor Vehicles* (1983) 148 Cal.App.3d 165, 170–171 [195 Cal.Rptr. 707].)

### The Phlebotomist Issue

■ McHugh argues that San Diego law enforcement agencies knowingly and systematically violate section 23158 by using phlebotomists to conduct blood draws, and the trial court should have suppressed the results of the blood-alcohol test as a sanction for that conduct.[9] In *People v. Esayian* (2003) 112 Cal.App.4th 1031 [5 Cal.Rptr.3d 542], this court recently confronted the issue

---

[8] These findings are supported by substantial evidence, and McHugh does not contend otherwise.

[9] McHugh also argues that section 23158 permits blood to be drawn only at the direction of a "peace officer," and Rossi was not a peace officer entitled to direct Dominguez to take McHugh's blood sample, and for that reason the evidence should have been suppressed. However, Rossi was a peace officer authorized by Penal Code section 830.32 to make "an arrest." An arrest involves "taking a person into custody . . . in the manner authorized by law" (Pen. Code, § 834), and the law authorizes (as one incident of an arrest for driving under the influence) the administration of a chemical test. Accordingly, Rossi was acting as a peace officer in transporting McHugh to jail and completing the searches authorized by law, including the administration of the blood draw.

of whether the fact that a blood draw was performed by a phlebotomist rather than by a person described in section 23158, subdivision (a) made the search unreasonable under the Fourth Amendment. *Esayian*, adhering to our Supreme Court's decision in *People v. McKay, supra*, 27 Cal.4th 601 as well as the decision in *People v. Ford, supra*, 4 Cal. App.4th 32, held that the litmus test on a motion to suppress under the Fourth Amendment is the *manner* in which the blood was drawn, and that violation of a state regulatory scheme "does not render [a search] unreasonable within the Fourth Amendment and that such statutory violations cannot serve as the basis for the application of the exclusionary rule." (*Esayian, supra*, at pp. 1038–1041.) *Esayian* reasoned: "In [*Ford*], the court dealt with a challenge to the drawing of blood in violation of the same statutory scheme as before us in which the defendant argued the taking of the blood without informed consent violated the statute and such violation compelled exclusion of the evidence taken. The court in *Ford* examined the requirements of [*Schmerber*], in the context of a claimed statutory violation. The court declined to decide whether the lack of informed consent violated the statute. Rather the court in *Ford* held the question under *Schmerber* was whether 'the manner in which the sample was obtained' rendered the procedure constitutionally impermissible. (*Ford, supra*, 4 Cal.App.4th at p. 37; [citation]. . . .) [¶] We believe that the reasoning of [*McKay* and *Ford*] require rejection of Esayian's contention in this case. The mere fact that the phlebotomist may not have fully complied with the statutory requirements of section 23158, subdivision (a) does not create a Fourth Amendment violation. There may be other remedies available to challenge governmental activity in violation of statutes and regulations. However, such violations, without more, do not render a search or seizure unreasonable within the meaning of the Fourth Amendment." (*Esayian, supra*, at p. 1039.)

 McHugh does not contend the blood draw here was conducted in an unreasonable manner or violated medically approved techniques.[10] Accordingly, under *Esayian*, the mere fact Dominguez did not have the license held

---

[10] Substantial evidence supports the conclusion that the manner of the blood draw was reasonable. Dominguez had worked for over four years as a phlebotomist, performing between 50 to 70 venipunctures per month, and was on duty at police headquarters when McHugh was brought into room 138. Although the police department employs people to clean the room, Dominguez (as part of her standard procedure) cleaned off the counter with sanitizing solution and put sheets down on the table. She drew McHugh's blood using the same procedures she used in every blood draw. She used a 21-gauge needle (sealed in factory packaging) and a Vacutainer device to draw the blood. She put on rubber gloves, used a tourniquet on McHugh's upper arm to expose a vein, and then selected a site and cleaned it with a sterilizing solution. She removed the needle, inserted it into the Vacutainer holder, and then inserted the needle at the sterilized site and drew the blood. When the tube was filled, she withdrew the needle, applied pressure and a bandage to the site the blood was drawn from, and discarded the needle. Ms. Cresci, a registered nurse, testified Dominguez used medically approved practices and procedures to draw McHugh's blood.

by those persons described in section 23158 does not make the blood draw unreasonable within the meaning of the Fourth Amendment. (*People v. Esayian, supra,* 112 Cal.App.4th at pp. 1039–1041.)

██ McHugh argues, however, that when a law enforcement agency deliberately and systematically violates a state statute governing the collection of evidence, a court may order the evidence suppressed. McHugh cites no pertinent authority supporting this contention,[11] and his argument is contrary to the Supreme Court's analysis in *People v. McKay, supra,* 27 Cal.4th 601, holding that an arrest otherwise reasonable under the Fourth Amendment does not become unreasonable for purposes of the exclusionary rule merely because it was effected in violation of a state statutory requirement. (*Id.* at pp. 613–619.)

## DISPOSITION

The judgment is affirmed.

Benke, Acting P. J., and Huffman, J., concurred.

A petition for a rehearing was denied June 30, 2004, and appellant's petition for review by the Supreme Court was denied September 22, 2004. George, C. J., did not participate therein.

---

[11] McHugh's principal citation for this proposition, *In re Garinger* (1987) 188 Cal.App.3d 1149 [233 Cal.Rptr. 853], did not apply the exclusionary rule as a sanction for a systematic violation of state statutes; accordingly, any statement in *Garinger* hinting at the theoretical possibility of such a sanction is dicta. McHugh's reliance on *Atwater v. City of Lago Vista* (2001) 532 U.S. 318 [149 L.Ed.2d 549, 121 S.Ct. 1536] undermines his argument. The Supreme Court, after concluding Atwater's arrest (albeit for a very minor traffic infraction) nevertheless satisfied constitutional requirements because probable cause existed, examined whether the arrest became unreasonable because it was performed in an " 'extraordinary manner, unusually harmful to [her] privacy or . . . physical interests.' " (*Atwater, supra,* at p. 354, quoting *Whren v. United States* (1996) 517 U.S. 806, 818 [135 L.Ed.2d 89, 116 S.Ct. 1769].) The court stated that, "[a]s our citations in *Whren* make clear, the question whether a search or seizure is 'extraordinary' turns, above all else, on the manner in which the search or seizure is executed. [Citations.] Atwater's arrest was surely 'humiliating,' as she says in her brief, but it was no more 'harmful to . . . privacy or . . . physical interests' than the normal custodial arrest." (*Atwater, supra,* at p. 354.) Similarly, the *manner* of the blood draw was not extraordinary because, to paraphrase *Atwater,* having Dominguez rather than a licensed person draw McHugh's blood rendered the manner of the draw "no more 'harmful to [McHugh's] . . . privacy or . . . physical interests' than the normal [blood draw]."