[No. D044282. Fourth Dist., Div. One. May 12, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
ERIK HANS MATELJAN, Defendant and Appellant.
[And five other cases.*]

*People v. Short, Jr., D044283 (Super. Ct. No. M875427); People v. Davari, D044516 (Super. Ct. No. CN148819); People v. Yui, D044517 (Super. Ct. No. CN148673); People v. Fanale, D044519 (Super. Ct. No. CN145324); and People v. Paulick, D044520 (Super. Ct. No. CN149604).

**COUNSEL**

Gary Nichols, County Public Defender, for Defendant and Appellant Willie Augusta Short, Jr.

Mary Frances Prevost for Defendants and Appellants Erik Hans Mateljan, Matin Davari, Brian Yui, Benjamin Fanale and Carol L. Paulick.

Casey Gwinn, City Attorney, Susan M. Heath, Assistant City Attorney, Monica A. Tiana and Stephen Hanson, Deputy City Attorneys; Bonnie M. Dumanis, District Attorney, Kim-Thoa Hoang, Chief Deputy District Attorney, Anthony Lovett, Assistant Chief Deputy District Attorney, and Laura E. Tanney, Deputy District Attorney, for Plaintiff and Respondent.

## OPINION

**BENKE, Acting P. J.**—Since February 11, 2004, Vehicle Code[1] section 23158 has permitted certified phlebotomists to draw blood without direct supervision from a physician or registered nurse from persons suspected of driving under the influence of alcohol. However, each of the appellants in this case was suspected of driving under the influence and taken into custody before February 11, 2004. Each appellant elected to have a blood test rather than a breath test. In each case, although the practice had not yet been authorized by the Legislature, a phlebotomist acting without direct supervision from a physician, registered nurse, licensed clinical laboratory scientist or analyst drew the suspect's blood. According to an expert offered by the People, the draws were accomplished in a manner which did not create any medical risk for the suspects.

By way of motions to suppress, each appellant argued that the absence of statutory authority to use phlebotomists should prevent the prosecution from relying on the blood which had been drawn from him or her. The trial court denied their motions, the appellate division affirmed the trial court's ruling and granted appellants' application for certification to this court. We transferred the appeals and consolidated them.

We affirm the trial court's orders. In two prior cases, *People v. Esayian* (2003) 112 Cal.App.4th 1031 [5 Cal.Rptr.3d 542] (*Esayian*) and *People v. McHugh* (2004) 119 Cal.App.4th 202 [14 Cal.Rptr.3d 142] (*McHugh*), we rejected somewhat similar attacks on blood evidence drawn by phlebotomists and used in convicting defendants of driving under the influence. Here, in addition to the Fourth Amendment and due process arguments raised in *Esayian* and *McHugh*, appellants argue use of phlebotomists deprived them of equal protection of the law. We reject this argument as well. The use of phlebotomists did not discriminate against appellants on any invidious basis. Hence use of phlebotomists did not deny appellants equal protection of the law.

### SUMMARY

### A. *City of San Diego*

Nineteen of the appellants were arrested in the City of San Diego[2] on suspicion of drunk driving and chose to provide law enforcement officers with blood samples rather than perform a breath test. All of their arrests

---

[1] All further statutory references are to the Vehicle Code unless otherwise indicated.

[2] The arrests were either in the City of San Diego or in areas of the County of San Diego where by agreement the city attorney is responsible for prosecuting misdemeanors.

occurred before February 11, 2004, and all of their blood samples were drawn by phlebotomists employed by American Forensic Nurses (AFN), a corporation which had contracted with a number of San Diego law enforcement agencies to take blood tests of drunk driving suspects.

In moving to suppress their blood tests, appellants joined 48 other drunk driving suspects whose blood had been drawn by AFN phlebotomists before February 11, 2004. They argued that in using phlebotomists, the City of San Diego violated their Fourth Amendment right to be free of unreasonable searches and seizures, their right to due process of law and their right to equal protection of the laws.

The trial court conducted a fairly extensive evidentiary hearing on the motion to suppress. The parties stipulated that each of the appellants was stopped by a law enforcement officer after the officer observed behavior which led the officer to believe the suspect had been driving under the influence of alcohol. They further stipulated that the suspects consented to the blood tests and that the blood draws were done at the request of law enforcement officers. At the hearing the prosecution offered the testimony of the principal owner of AFN, Faye Battiste-Otto. Otto stated that in 1999 she began having difficulty providing personnel qualified under section 23158 to draw blood and met her contractual obligations to San Diego area law enforcement agencies with phlebotomists. According to Otto, she could not on an economic basis provide personnel who met the requirements of section 23158. With the knowledge of the supervising criminalist of the San Diego Police Department and other city officials, AFN used phlebotomists until November 2003.

All of the phlebotomists used by AFN had received postsecondary training as medical assistants, including instruction in phlebotomy. Each of the phlebotomists testified as to their respective training and experience and the procedures each used in drawing a suspect's blood. The city also offered the testimony of a registered nurse, Alice Cresci, who testified that the phlebotomists performed the blood draws in a medically appropriate manner. Her testimony was supported by the testimony of Dr. Leland Rickman, a University of California at San Diego (UCSD) physician who specializes in infectious diseases.

In support of their joint motion, the suspects offered testimony from the phlebotomy manager of Pomerado Hospital, Ted Drescher. Drescher testified that the procedures employed by AFN's phlebotomists did not comply with his hospital's disposal protocols. Drescher's testimony was supported by Leslie Revier, the Chief of Quality Assurance at UCSD clinical laboratories. He criticized the decontamination and storage practices of the AFN

phlebotomists. In criticizing AFN's phlebotomists, Revier also testified that a medical history should be taken before blood is drawn and that tourniquets left on patients for more than four minutes might cause injury.

The joint motion was also supported by testimony from a registered nurse, Patricia Hunter, who testified that it is not medically acceptable to permit phlebotomists to draw blood unless they are under the direct supervision of a physician, nurse or licensed clinical laboratory scientist.

The trial court denied the motion to suppress. The trial court found that the use of phlebotomists did not create any undue medical risk to the drunk driving suspects and that the city's violation of section 23158 did not constitute a violation of the Fourth Amendment or any denial of due process or equal protection of the law. As indicated, 19 of the suspects appealed to the appellate division, which certified their equal protection claim to this court. We transferred the case to our court.

### B.   *County of San Diego*

Four of the appellants were stopped in areas of the County of San Diego, where the district attorney is responsible for prosecuting misdemeanors. Like the 19 appellants prosecuted by the city attorney, they moved to suppress the blood draws performed by AFN phlebotomists. They too argued that the use of phlebotomists violated the Fourth Amendment and deprived them of due process and equal protection of the law.

Much of the testimony used in the motion brought in the city's prosecution was introduced in the county proceeding. In addition the county offered the testimony of a medical expert, Dr. Howard Robin. Dr. Robin was formerly a phlebotomist himself and is a licensed pathologist, the Medical Director of Laboratory Services at Sharp Memorial Hospital, director of the hospital's blood blank and a former chairman of the Physician's Committee of the California Blood Bank system. According to Dr. Robin, it is standard medical procedure in San Diego to use phlebotomists to draw blood rather than registered nurses or licensed vocational nurses. He believes phlebotomists are more proficient at drawing blood than registered or licensed vocational nurses. Robin testified that the procedure used by AFN's phlebotomists were, with one exception, medically acceptable. He criticized one phlebotomist's use of nonsterile cotton to dry disinfected venipuncture sites before inserting a needle; however, Dr. Robin testified that this created a miniscule risk of infection.

In response to questions about the length of time phlebotomists left tourniquets on patients, the storage of their equipment, their use of gloves and whether they washed their hands, Dr. Robin testified that none of those issues was medically significant. According to Dr. Robin, it is not medically necessary that phlebotomists take a medical history before drawing blood.

The trial court denied the county appellants' motion. Like the city appellants, the county appellants appealed to the appellate division and the appellate division certified their equal protection claim. We transferred the county appellants' appeal to our court and consolidated their appeal with the city appellants' appeal.

## DISCUSSION

### I

■ Before we examine the merits of the parties' contentions, we set forth the appropriate standard of review. "On appeal from a denial of a motion to suppress evidence on Fourth Amendment grounds we review the historical facts as determined by the trial court under the familiar substantial evidence standard of review. Once the historical facts underlying the motion have been determined, we review those facts and apply the de novo standard of review in determining their consequences. Although we give deference to the trial court's factual determinations we independently decide the legal effect of such determinations. [Citation.]" (*Esayian, supra,* 112 Cal.App.4th at p. 1038.)

### II

Prior to February 11, 2004, section 23158, subdivision (a), provided in pertinent part: "Only a licensed physician and surgeon, registered nurse, licensed vocational nurse, duly licensed clinical laboratory technologist or clinical laboratory bioanalyst, unlicensed laboratory personnel regulated pursuant to Sections 1242, 1242.5, and 1246 of the Business and Professions Code, or certified paramedic acting at the request of a peace officer may withdraw blood for the purpose of determining the alcoholic content therein." (Stats. 1998, ch. 118, § 30.)

■ Notwithstanding the limitation set forth in former section 23158, subdivision (a), in *Esayian*, we found that a law enforcement agency did not violate the Fourth Amendment when, rather than using someone with the qualifications required by the statute, the agency used a phlebotomist to draw

blood from the defendant. We stated: "The mere fact that the phlebotomist may not have fully complied with the statutory requirements of section 23158, subdivision (a) does not create a Fourth Amendment violation. There may be other remedies available to challenge governmental activity in violation of statutes and regulations. However, such violations, without more, do not render a search or seizure unreasonable within the meaning of the Fourth Amendment." (*Esayian, supra*, 112 Cal.App.4th at p. 1039; see also *People v. McKay* (2002) 27 Cal.4th 601, 607–619 [117 Cal.Rptr.2d 236, 41 P.3d 59] (*McKay*).[3])

We also found that the manner in which the blood was drawn complied with the underlying protection of the Fourth Amendment as articulated in *Schmerber v. California* (1966) 384 U.S. 757, 767 [16 L.Ed.2d 908, 86 S.Ct. 1826].) We stated: "There is nothing in this record to justify an inference that the manner of drawing the blood was unsanitary, or subjected the suspect to any unusual pain or indignity. It is undisputed the draw was supported by probable cause and done under exigent circumstances, i.e., that the alcohol in the blood would metabolize and thus could be drawn without a prior judicial

---

[3] In *McKay* the defendant was stopped while riding a bicycle and taken into custody for failing to present satisfactory evidence of his identity. While being searched incident to his arrest, officers discovered methamphetamine in his possession. In moving to suppress the methamphetamine, the defendant argued that he had produced satisfactory evidence of his identity and that his arrest therefore violated section 40302. The Supreme Court held that any violation of the statute by the arresting officers would not support suppression under the Fourth Amendment. The court stated: "It will come as no surprise . . . that the United States Supreme Court has never ordered a state court to suppress evidence that has been gathered in a manner consistent with the federal Constitution but in violation of some state law or local ordinance. To the contrary, the high court has repeatedly emphasized that the Fourth Amendment inquiry does not depend on whether the challenged police conduct was authorized by state law." (*McKay, supra*, 27 Cal.4th at p. 610, fn. omitted.) As the court explained: "What would be gained, after all, by invoking the federal Constitution to exclude evidence seized following an arrest merely because, in violation of state law, a nonuniformed police officer failed to display a badge (e.g., *Drewitt v. Pratt* (4th Cir. 1993) 999 F.2d 774, 777 [the violation of Virginia law 'did not rise to a violation of a federal constitutional magnitude']), a uniformed officer effected an arrest beyond the officer's territorial limit (e.g., *People v. Wolf* (Colo. 1981) 635 P.2d 213, 217–218 [denying the suppression motion '[d]espite the fact that the Denver police violated the statutes governing their authority to arrest']), or a deputy's commission suffered from technical administrative deficiencies (e.g., *U.S. v. Jones* (5th Cir. 1999) 185 F.3d 459, 462–463 [state law deficiency 'does not affect our analysis' of the constitutional issue])? 'The exclusionary rule was created to discourage violations of the Fourth Amendment, not violations of state law.' (*U.S. v. Walker* [(1992)] 960 F.2d [409,] 415.) Constitutionalizing the myriad of technical state procedures that govern arrests would not only trivialize Fourth Amendment protections but would discourage states from even enacting such rules. (Cf. *United States v. Caceres* [(1979)] 440 U.S. [741,] 755–756.)" (*McKay, supra*, 27 Cal.4th at p. 615.)

authorization. [Citation.] The trial court found the blood was properly drawn and nothing in the record compels a different conclusion." (*Esayian, supra,* 112 Cal.App.4th at p. 1041.)

■ Finally, we found that admission of blood evidence taken in violation of the statute did not violate the defendant's due process rights. We noted that the defendant was represented at trial by counsel who vigorously attacked the credibility of the blood evidence and that the defendant presented expert testimony critical of the manner in which the defendant's blood sample was stored, preserved and processed. (*Esayian, supra,* 112 Cal.App.4th at pp. 1041–1042.) We stated: "A person seeking to overturn a conviction on due process grounds bears a heavy burden to show the procedures used at trial were not simply violations of some rule, but are fundamentally unfair. [Citations.] Ordinarily, even erroneous admission of evidence does not offend due process unless it is so prejudicial as to render the proceeding fundamentally unfair." (*Id.* at p. 1042.) Thus we concluded that even though the defendant had not raised his due process claim in the trial court, "[g]iven the nature of this record, however, even if we did not treat this issue as waived, there is nothing in the case before us to demonstrate that admission of evidence taken in violation of a statute violates the principles of due process." (*Ibid.*)

In *McHugh* a defendant again argued that blood drawn by a phlebotomist should be suppressed. In *McHugh* the blood was drawn involuntarily after the defendant refused to either take a breathalyzer test or voluntarily provide a blood sample. We presumed, as appellants assert here, that San Diego law enforcement agencies deliberately and systematically used phlebotomists in violation of section 23158. (*McHugh, supra,* 119 Cal.App.4th at p. 211, fn. 7.) Nonetheless, we again found that violation of the statute did not require suppression of the blood evidence. "McHugh argues, however, that when a law enforcement agency deliberately and systematically violates a state statute governing the collection of evidence, a court may order the evidence suppressed. McHugh cites no pertinent authority supporting this contention, and his argument is contrary to the Supreme Court's analysis in *People v. McKay, supra,* 27 Cal.4th 601, holding that an arrest otherwise reasonable under the Fourth Amendment does not become unreasonable for purposes of the exclusionary rule merely because it was effected in violation of a state statutory requirement. [Citation.]" (*McHugh, supra,* 119 Cal.App.4th at p. 214, fn. omitted.)

On February 11, 2004, the Governor signed, as an urgency measure, Assembly Bill No. 371 (2003–2004 Reg. Sess.). It amended section 23158,

which now in pertinent part provides: "(a) Notwithstanding any other provision of law, only a licensed physician and surgeon, registered nurse, licensed vocational nurse, duly licensed clinical laboratory scientist or clinical laboratory bioanalyst, a person who has been issued a 'certified phlebotomy technician' certificate pursuant to Section 1246 of the Business and Professions Code . . . may withdraw blood for the purpose of determining the alcoholic content therein."

## III

As the city and county note, even if we were to go beyond the equal protection question certified by the appellate division and consider the Fourth Amendment and due process questions also raised by appellants, we would be compelled to affirm the trial court's orders. As both *Esayian* and *McHugh* make clear, the fact that blood was taken from appellants in violation of section 23158 does not implicate their rights under the Fourth Amendment. Rather, the only Fourth Amendment question we are required to consider is whether, under the circumstances, the blood was in fact taken in a reasonable manner. As in *Esayian*, there is no dispute here that the blood was taken from appellants on probable cause and under the exigency created by metabolization of alcohol in appellants' respective bloodstreams. Moreover, in light of the expert testimony presented by the city and county, the trial court could conclude that the draws were performed in a manner which did not create undue harm or risk to appellants.[4] Thus the draw did not intrude upon appellants' Fourth Amendment rights. (See *Schmerber v. California, supra,* 384 U.S. at p. 767.)

As in *Esayian* there is no basis to conclude use of the evidence taken by the draws violated appellants' right to due process. Appellants were fully capable of contesting the right of the law enforcement agencies to take the blood and the validity of the blood tests themselves. As in *McHugh*, we accept appellants' contention that the use of phlebotomists who did not meet the then existing requirements of section 23158 was deliberate and systematic. However, as the court in *McHugh* concluded, that deliberate and systematic violation of the statute does not establish any violation of the Constitution. (*McHugh, supra,* 119 Cal.App.4th at p. 214.) In this regard, like

---

[4] We also reject appellants' suggestion, raised for the first time at oral argument, that the failure to disclose information about the use of phlebotomists somehow implicated their rights under *Brady v. State of Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194]. In general, we are not required to consider arguments raised for the first time at oral argument. (See *People v. Pena* (2004) 32 Cal.4th 389, 403 [9 Cal.Rptr.3d 107, 83 P.3d 506].) Moreover, it is apparent that despite any alleged failure of the prosecution to disclose information about the phlebotomists, appellants' counsel was fully aware of the information at the time of trial. Even on the limited record before us it is clear that no due process violation occurred.

the court in *McKay*, we by no means countenance the law enforcement agencies' violation of a statute. Indeed, what the court in *McKay* said with respect to a law enforcement's violation of statutory rights designed to protect the public in general and criminal suspects in particular, bears repeating: "Violation of those rights exposes the peace officers and their departments to civil actions seeking injunctive or other relief. (*Garrett v. City of Bossier City* (La.Ct.App. 2001) 792 So.2d 24, 26–28 [although the arrest for a seatbelt offense was constitutional under *Atwater*, the arrest's failure to comply with state procedure supported a private civil suit]; see generally *People v. Mayoff* (1986) 42 Cal.3d 1302, 1318 [233 Cal.Rptr. 2, 729 P.2d 166] (plur. opn. of Grodin, J.).) Violation of those state rights also may subject the offending officer to an internal investigation, additional training, and departmental discipline. (See Heffernan, *Foreword: The Fourth Amendment Exclusionary Rule as a Constitutional Remedy* (2000) 88 Geo. L.J. 799, 865 ['A direct sanction imposed on individual officers—internal police discipline, for example—is likely to channel police behavior into patterns of legal conduct far more effectively than does the indirect sanction of exclusion'].)" (*McKay, supra*, 27 Cal.4th at pp. 618–619.)

In sum then neither the Fourth Amendment nor due process requires suppression of the blood drawn from appellants.

## IV

In neither *Esayiann* nor *McHugh* did we consider appellants' argument that use of phlebotomists violated their right to equal protection of the law. However, their equal protection argument is no more persuasive than their Fourth Amendment and due process contentions.

█ " '[I]n order to establish a claim of discriminatory enforcement a defendant must demonstrate that he has been deliberately singled out for prosecution on the basis of some invidious criterion.' [Citation.]" (*Baluyut v. Superior Court* (1996) 12 Cal.4th 826, 834 [50 Cal.Rptr.2d 101, 911 P.2d 1], quoting *Murgia v. Municipal Court* (1975) 15 Cal.3d 286, 298 [124 Cal.Rptr. 204, 540 P.2d 44].)

" '[A] denial of equal protection would be established if a defendant demonstrates that the prosecutorial authorities' selective enforcement decision "was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.". . . . In the instant case we have no occasion to consider the entire range of classifications that may be "arbitrary" in this context, i.e., that bear no rational relationship to legitimate law enforcement interests . . . . ' [Citation.]" (*Baluyut v. Superior Court, supra,* 12 Cal.4th at p. 835, quoting *Murgia v. Municipal Court, supra,* 15 Cal.3d at p. 302.)

Here the sole circumstance which made appellants subject to prosecution was behavior which gave law enforcement agencies reason to suspect appellants had been driving under the influence of alcohol. Thus there is no basis upon which we could conclude that prosecution of appellants was the product of any arbitrary, irrational or invidious discrimination. The fact that, *following their arrests*, they were treated differently than other drunk driving suspects in the state, in no sense suggests that the decision to detain and prosecute them was based on any arbitrary or discriminatory factor.

Parenthetically, we note the record shows that use of phlebotomists itself was directly related to the determination by both law enforcement agencies that it was no longer economically feasible to obtain blood draws from registered nurses or other persons qualified under the former version of section 23158. The agencies' conclusion is of course buttressed by the fact that the Legislature apparently reached the same conclusion and amended section 23158 on an urgency basis to permit blood to be drawn by phlebotomists. While, again, we do not condone the agencies' decision to serve that interest in a manner not authorized by the Legislature, for equal protection purposes the critical consideration is that the *interest* the agencies were attempting to serve was a legitimate interest: enforcement of the state's drunk driving laws.

In sum, because appellants were not subjected to prosecution on any arbitrary or invidious basis and because the means employed in prosecuting them was not chosen on any arbitrary or invidious basis, they cannot assert any equal protection claim.

## V

In this case and in the two cases in which we have previously considered, the conceded violation of section 23158 by the City of San Diego and the County of San Diego, *Esayian* and *McHugh*, we have consistently found that, whatever other consequence might arise from violation of the statute by these governmental entities, the suppression of probative evidence of intoxication is not a remedy available to the defendants. As the court in *McKay* noted, instead of weakening the protection provided by such statutes as section 23158, relying on other civil and administrative remedies for statutory violations may in fact encourage state and local governments to adopt such statutory protections and alternative means of enforcing them. (*McKay, supra,* 27 Cal.4th at p. 619.) "[E]liminating the sanction of exclusion does not mean that affected individuals or the public generally are without remedy against a wayward officer. 'We, the judiciary, cannot claim that we and we alone wield the only power or possess the only wisdom to enforce rules.' [Citation.]" (*Ibid.*)

The orders are affirmed.

Huffman, J., and Haller, J., concurred.

A petition for a rehearing was denied June 1, 2005, and appellant's petition for review by the Supreme Court was denied August 24, 2005.