

# COURT OF APPEALS

## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-08-246-CR

THE STATE OF TEXAS                                                    APPELLANT

V.

CHRISTI LYNN JOHNSTON                                                 APPELLEE

------------

FROM COUNTY CRIMINAL COURT NO. 3 OF TARRANT COUNTY

------------

## OPINION

------------

The State appeals from the trial court's order granting appellee Christi Lynn Johnston's motion to suppress the results of her blood test in this misdemeanor driving while intoxicated prosecution. We affirm the suppression order.

**Background Facts**

The trial court found the following pertinent facts. Officer Brett Stinson of the Dalworthington Gardens Police Department pulled appellee over after

observing her driving and learning that her vehicle registration had expired. After determining that she exhibited signs of intoxication, he gave her field sobriety tests and then arrested her for DWI. Officer Stinson took appellee to the Dalworthington Gardens Police Department where he conducted a DWI interview and second field sobriety test on video, read appellee the required statutory warnings (DIC-24 form), and asked appellee if she would give a blood sample. She refused. Officer Stinson did not ask appellee to give a breath specimen because the department's policy was to ask only for a blood specimen.

After appellee refused to give a blood sample, Officer Stinson prepared an affidavit to obtain a search warrant authorizing a blood draw, which was authorized by a Dalworthington Gardens city judge, who presides over a court of record. Then Officer Darren Burkhart, with Officer Stinson's assistance, "forcibly obtain[ed]" a blood specimen from appellee. Appellee initially resisted and was "unruly." Thus, the officers had to "secure[] [appellee's] legs to the legs of the chair and secure[] one arm to the arm of the chair" with flexible gauze. Officer Stinson held the other arm while Officer Burkhart obtained the blood sample from the vein in appellee's wrist. Once appellee was restrained, she calmed down and did not resist anymore. The trial court found that the officers "followed medically accepted procedures in drawing [appellee's] blood."

2

The officers drew appellee's blood according to a Dalworthington Gardens Police Department program

> set up and . . . supervised by Dr. [Joe] Del Principe, a doctor of osteopathy, licensed to practice medicine in the State of Texas, with 22–23 years of emergency room experience. . . . There is no peer review of the program established by Dr. Del Principe nor is there any governmental or other regulatory agency that has approved the program or that establishes the curriculum and/or monitors any rules of compliance or activity.

Officers take fourteen hours of classroom lecture and are given a standard phlebotomy text and photocopies of articles on venipuncture as outside reading material. They must also do a minimum of fifty venipuncture draws at a hospital. Officers Stinson and Burkhart received certificates indicating they had successfully completed the program. However, the trial court found that "[t]his course of study falls short of the minimum requirements for a person to become a phlebotomy technician."

At the time of the draw, Officer Stinson was an "EMT basic" and Officer Burkhart was an "EMT intermediate." Officer Burkhart testified at the suppression hearing that he had performed "thousands" of blood draws in the sixteen years he had been an EMT.[1]

---

[1] He had participated in over 1600 classroom hours as an EMT; he estimated that at least forty of those hours related to venipuncture. The training he received from Dr. Del Principe was in addition to those forty hours. Officer Burkhart had also worked as a firefighter, and at the time of the

3

The trial court further found that

> [t]he blood draw was done in a room located in the Dalworthington Gardens Police Department building and the room was equipped for the purpose of doing blood draws. The room also was used by officers to walk through and operate the DWI video equipment. The room was checked and cleaned before drawing blood in this case by the officers. The clean room checklist . . . follows accepted medical procedures and was followed in this case. The room where the blood specimen was obtained was a sanitary place for such purpose.

Based on these findings of fact, the trial court concluded that Officer Stinson had probable cause to arrest appellee, that the search warrant for appellee's blood was lawful and valid, and that the officers used only the force necessary to obtain the sample. But the trial court further concluded as follows:

> 6.    In obtaining the blood sample, the officers were acting in their capacity of peace officers gathering evidence for a criminal prosecution and not in the capacity [of] professional medical care providers providing medical services.

> 7.    A phlebotomist is not automatically a qualified technician under § 724.017 of the Transportation Code.

> 8.    The completion of the program established by Dr. Del Principe for the Dalworthington Gardens Police Department does not qualify one as a qualified technician *under* § *724.017 of the Transportation Code*.

---

suppression hearing, was working as a firefighter for the City of Pantego.

4

9.    [Appellee's] blood sample was seized pursuant to a search warrant validly executed in accordance with articles 18.01 and 18.02 of the Code of Criminal Procedure in order to obtain evidence to prosecute [appellee] for the crime of driving while intoxicated as proscribed in Tex. Penal Code § 49.04.

10.    Tex. Transp. Code § 72[4].017(a) & (c) governs the taking of blood samples seized in the prosecution of all intoxication-related driving offenses.

11.    Tex. Transp. Code § 724.017(a) & (c) governs the taking of blood samples seized pursuant to a search warrant under articles 18.01 and 18.02 of the Texas Code of Criminal Procedure for intoxication-related driving offenses.

12.    Although the State complied with Tex. Trans. Code § 724.017(a) by having the blood draw taken in a sanitary place, the seizure *violated the Fourth Amendment's reasonableness requirement by not being taken by medical personnel in a hospital or medical environment*.

13.    Officer Burkhart is not a qualified technician under § 724.017 of the Transportation Code.  Pursuant to the Transportation Code § 724.017, as an EMT Officer . . . Burkhart is specifically excluded from taking blood samples from defendants arrested for driving while intoxicated.

14.    The blood seized from [appellee] by Officer . . . Burkhart pursuant to a search warrant is not admissible as a matter of law.

[Emphasis added, citation omitted.]  Thus, the trial court ordered that the results of appellee's blood test be suppressed.  The State appeals from that order.

5

**Standard of Review**

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). Because the trial court found that each of the witnesses testifying was credible and reliable, the issues involved in this appeal are the trial court's legal conclusions, which we review de novo. *See Amador*, 221 S.W.3d at 673.

**Issues on Appeal**

The State presents six points challenging the suppression order. In its first three points, the State contends that the trial court's decision runs afoul of the Fourth Amendment's preference for warrant-based seizures, the Fourth Amendment's good faith exception, and the Court of Criminal Appeals's opinion in *Beeman v. State*, 86 S.W.3d 613 (Tex. Crim. App. 2002). In its last three points, the State challenges the trial court's rulings that chapter 724 of the

6

transportation code—the implied consent statute—governs the taking of blood samples seized pursuant to a warrant, that sections 724.017(a) and (c) govern the taking of blood samples in all intoxication-related driving offenses, and that the Dalworthington Gardens Police Department's blood draw program did not comply with the transportation code. Appellee, however, frames the issue thusly:

> [I]t is undisputed that the police had probable cause and had obtained a lawful search warrant to compel [her] to submit to the blood draw. . . . [But the] trial court's ruling . . . should be affirmed because, *regardless of the justification for issuance of the warrant, the means by which the police chose to execute that search warrant were unreasonable*. [Emphasis added.]

According to appellee, then, even blood draws pursuant to a warrant must be performed by a "*civilian* health care professional" in a medical environment in accordance with the minimum standards set out in chapter 724 of the Transportation Code. [Emphasis added.] Because the State briefs most of its points together, we will address them by topic rather than in consecutive order.

### *Schmerber v. California* and Chapter 724 of Transportation Code

The Fourth Amendment protects against unreasonable searches and seizures by government officials. U.S. Const. amend. IV; *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007). The taking of a blood sample implicates the Fourth Amendment. *Schmerber v. Calilfornia*, 384 U.S. 757,

7

767, 86 S. Ct. 1826, 1834 (1966); *Ramos v. State*, 124 S.W.3d 326, 331 (Tex. App.—Fort Worth 2003, pet. ref'd).

In *Schmerber*, the United States Supreme Court held that a *warrantless* blood draw performed at a police officer's direction by a physician in a hospital "according to accepted medical practices" was reasonable under the Fourth Amendment. *Schmerber*, 384 U.S. at 771–72, 86 S. Ct. at 1836; *State v. Comeaux*, 818 S.W.2d 46, 53 (Tex. Crim. App. 1991) (plurality op.). The Court determined that to be valid, such a *warrantless* search must (1) be supported by probable cause, (2) occur in the presence of exigent circumstances in which the delay necessary to obtain a warrant would result in the destruction of evidence, (3) employ a reasonable test, and (4) be executed in a reasonable manner. *Schmerber*, 384 U.S. at 769–72, 86 S. Ct. at 1835–36; *see Comeaux*, 818 S.W.2d at 53. The Court made clear that when a search involves a bodily intrusion, such as a blood draw, the execution of the search must be accomplished in a reasonable manner, i.e., according to reasonable "means and procedures," even when the search itself is justified. *Schmerber*, 384 U.S. at 768, 86 S. Ct. at 1834; *see Blumenstetter v. State*, 135 S.W.3d 234, 243 (Tex. App.—Texarkana 2004, no pet.) (citing *Schmerber* for the holding that "the taking of blood by a medical laboratory technician in a hospital is a reasonable method of extraction").

8

Although the Court specifically did not announce a holding governing cases in which the blood was drawn somewhere other than a hospital or by a person other than a doctor, nurse, or "medical laboratory technician," the Court did provide some future guidance as follows:

> We are thus not presented with the serious questions which would arise if a search involving use of a medical technique, even of the most rudimentary sort, were made by other than medical personnel or in other than a medical environment-*for example, if it were administered by police in the privacy of the stationhouse*. To tolerate searches under these conditions *might be* to invite an unjustified element of personal risk of infection and pain.

*Schmerber*, 384 U.S. at 771–72, 86 S. Ct. at 1836 (emphasis added).

Here, police obtained a warrant for a blood sample from appellee, who concedes on appeal that the warrant was valid and supported by probable cause.[2] Instead, appellee challenges "the means by which the police chose to execute that search warrant [as] unreasonable." In other words, she challenges the fourth *Schmerber* prong, that the search be executed in a reasonable manner. The State contends that the trial court should not have applied the holding in *Schmerber* and the statutory requirements of chapter 724 to

---

[2] Specifically, appellee states, "In this case, it is undisputed that the police had probable cause and had obtained a lawful search warrant to compel [a]ppellee to submit to the blood draw. Thus, the first prong of the *Schmerber* analysis goes in favor of the State, i.e., [a]ppellee does NOT contest that there was sufficient probable cause to support issuance of the warrant, or possibly, a warrantless blood draw."

determine the reasonableness of the blood draw because *Schmerber* and chapter 724 apply only to warrantless blood draws. According to the State, the fact that the blood was seized pursuant to a valid search warrant "controls this case and mandates the rejection of any attack against the admission of the seized blood evidence."

The State's contention that the resolution of this case—based upon the mere existence of a warrant—is "simple" ignores the requirement that even a search authorized by a warrant must nevertheless be executed according to reasonable means. *See, e.g.*, *Dalia v. State*, 441 U.S. 238, 258, 99 S. Ct. 1682, 1694 (1979); *Coleman v. State*, 833 S.W.2d 286, 290 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd). The *means* of execution is the focus of *Schmerber*'s fourth prong, not the justification for the search, which in this case was satisfied by the police's procurement of a valid warrant supported by probable cause. *See State v. Davis*, 207 P.3d 281, 285 (Kan. Ct. App. 2009) (holding, under Kansas law interpreting *Schmerber*, that although consent effectively replaces the probable cause and exigent circumstances requirements, it would not abrogate the State's responsibility to show that blood draw was nevertheless performed in reasonable manner); *Matter of Abe A.*, 437 N.E.2d 265, 269 (N.Y. 1982) (explaining that valid court order or warrant based upon probable cause replaces exigent circumstances requirement

10

articulated in *Schmerber*); *see also Schmerber*, 384 U.S. at 768, 86 S. Ct. at 1834. The resolution of the matter here, then, does not depend on whether the blood draw was taken pursuant to a warrant, as opposed to by express or implied consent; the resolution of this issue depends on whether the "means and procedures" by which the officers conducted the authorized blood draw were nevertheless reasonable. *Schmerber*, 384 U.S. at 768, 86 S. Ct. at 1834. Thus, we overrule the State's first point.

Under Texas law, absent the circumstances present in section 724.012(b) of the transportation code, police may obtain a blood sample only pursuant to the accused's express consent or a valid warrant. Tex. Transp. Code Ann. § 724.012(b) (Vernon Supp. 2009), § 724.013 (Vernon 1999); *Flores v. State*, 871 S.W.2d 714, 720 (Tex. Crim. App. 1993), *cert. denied*, 513 U.S. 926 (1994); *Muniz v. State*, 264 S.W.3d 392, 395 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *see* U.S. Const. amend IV. When police obtain a blood specimen pursuant to a warrant, as was done here, the requirements set forth in section 724.017 regarding blood draws are not mandatory; "consent, implied or explicit, becomes moot." *Beeman*, 86 S.W.3d at 616; *Cantrell v. State*, 280 S.W.3d 408, 412 (Tex. App.—Amarillo 2008, pet. ref'd). In other words, once the police obtain a valid warrant for blood "by presenting facts establishing probable cause to a neutral and detached magistrate," the subsequent search

11

must be evaluated under Fourth Amendment reasonableness standards. *Beeman*, 86 S.W.3d at 615–16; *Coleman*, 833 S.W.3d at 290. Because chapter 724, the implied consent statute, does not offer greater protection than the Fourth Amendment, and is simply "*another method* of conducting a constitutionally valid search," its prescribed method of obtaining blood draws is simply one way in which a blood draw can be deemed reasonable for admissibility purposes[3]; that is, if a search pursuant to implied consent is performed according to the parameters set forth in chapter 724, it will be reasonable under both the Fourth Amendment and Texas law. *Beeman*, 86 S.W.3d at 615 (emphasis added); *see* Tex. Transp. Code Ann. § 724.017(a) (Vernon Supp. 2009) (providing that blood must be drawn in "sanitary place" by "physician, qualified technician, chemist, registered professional nurse, or licensed vocational nurse"); *see also Schmerber*, 384 U.S. at 771–72, 86 S. Ct. at 1836 (authorizing blood draw according to "accepted medical practices" by medical professional in medical environment). But that does not mean that another method of obtaining a specimen pursuant to a warrant will be unreasonable under the Fourth Amendment simply because it was not taken in

---

[3] Section 724.017 additionally provides a statutory framework for ensuring that blood draws are performed in a safe manner for purposes of license revocation. *See Tex. Dep't of Pub. Safety v. Hutcheson*, 235 S.W.3d 312, 315–16 (Tex. App.—Corpus Christi 2007, pet. denied).

strict compliance with the implied consent statute's requirements. *See Beeman*, 86 S.W.3d at 615; *cf. Schmerber*, 384 U.S. at 769–72, 86 S. Ct. at 1835–36; *Coleman*, 833 S.W.2d at 290 (holding that blood draw by phlebotomist pursuant to warrant was reasonable despite language in warrant directing that draw be made by medical doctor). Thus, when a blood specimen is taken in accordance with a valid warrant, we must look to guiding Fourth Amendment principles to determine whether the method of taking the specimen is reasonable instead of chapter 724, the implied consent statute. *Beeman*, 86 S.W.3d at 615. For this reason, we conclude that if the requirements of the statute are considered in a Fourth Amendment case-by-case totality of the circumstances reasonableness analysis, they are merely to be considered as nonexclusive factors. *See Guzman v. State*, 955 S.W.2d 85, 90 (Tex. Crim. App. 1997) ("Each search and seizure question must turn on the facts of that particular case.").

Accordingly, we conclude and hold that the trial court's tenth and eleventh conclusions of law are erroneous. We sustain the State's third, fourth, and fifth points, but—having determined that chapter 724 does not exclusively govern the issue—we need not address the State's sixth point challenging the trial court's conclusion that the Dalworthington Gardens Police Department's

13

blood draw program does not comply with chapter 724.[4] *See* Tex. R. App. P. 47.1; *State v. Iduarte*, 232 S.W.3d 133, 140 (Tex. App.—Fort Worth 2007), *aff'd*, 268 S.W.3d 544 (Tex. Crim. App. 2008). However, because our sustaining these points does not end our inquiry into whether the blood test results here should have been suppressed, we must address the State's contention that the search was reasonable under the Fourth Amendment.[5]

### Reasonableness of Blood Draw Under Fourth Amendment

Whether a search is reasonable is a question of law that we review de novo. *Kothe v. State*, 152 S.W.3d 54, 62 (Tex. Crim. App. 2004). Reasonableness is measured by examining the totality of the circumstances. *Id*. at 63. It requires a balancing of the public interest and the individual's right to be free from arbitrary detentions and intrusions. *Id*. Accordingly, we must look at all circumstances surrounding the blood draw in this case.

**Officer Stinson's Testimony**

Officer Stinson, the arresting officer, testified to the procedure that Dalworthington Gardens police used in 2005 for suspicion of DWI arrests: "You take them back to our jail. We read them through the DWI

---

[4] Our holding also renders the trial court's seventh and eighth conclusions unnecessary.

[5] Although the State did not assign this complaint as a specific point, it does provide pertinent argument in its brief.

14

interview form, conducting the walk-and-turn test and one-leg stand in the DWI interview room. After they complete that, we read the DIC-24 form, requesting a sample of blood." The video taken in this case confirms that Officer Stinson followed this procedure with appellee. Officer Stinson did not ask for a breath or urine test, only blood, in accordance with the department rules that require him to ask only for blood. Appellee refused and acknowledged her refusal by signing the DIC-24. After appellee refused to consent to a blood draw, Officer Stinson placed her in the booking area and obtained a search warrant from the municipal judge.

It was three hours and forty-five minutes to four hours after the initial stop before Officer Stinson was able to obtain the warrant and return to the jail. Officer Stinson explained the procedure the department used for taking blood pursuant to a search warrant or consent:

> Before we take [a suspect] in, we inspect the room to make sure it's clean. Before getting any needles, vials, anything out, we wipe down the room with a commercial disinfectant to make sure everything's disinfected, the chair, the table, the stool that's in there; wipe it down and make it as clean as we possibly can before continuing on.

He explained that, to his knowledge, this procedure is followed every time officers take a blood draw; he followed it for appellee's blood draw. The room is also routinely inspected to make sure that it is clean. Although the room is

15

used only for blood draws, officers have to walk through it to operate the video recorder.

Officer Stinson testified that appellee was "unruly" at first when the officers tried to take her blood; specifically, she was "more or less pulling her arms up against her chest, kicking her legs, stuff of that nature." Officer Stinson did not think he needed to take appellee to the hospital because she was "fairly cooperative" after he and Officer Burkhart used soft Kerlix roll gauze to restrain her feet and left wrist to the blood draw chair.[6] Officer Stinson assisted Officer Burkhart in performing the blood draw by holding down appellee's left arm and handing him the vial. The officers did not videotape the blood draw because it was not required "under departmental rules."

Officer Stinson had been trained to do blood draws under Dr. Del Principe's program; he had performed "approximately 125, 130." He had done blood draws at Arlington Memorial Hospital under the supervision of nurses, who educated him on the "recognized medical procedures" that were supposed to be followed. Furthermore, according to Officer Stinson, Officer Burkhart followed these medically recognized procedures in drawing appellee's blood.

---

[6] Officer Stinson testified that appellee was still able to move her arm around.

16

On cross-examination of Officer Stinson, the following exchange occurred regarding his and Officer Burkhart's knowledge of appellee's medical condition that night:

Q. . . . What type of tourniquet did [Officer Burkhart] use?
A. Latex.
Q. Does my client have latex allergies?
A. Not sure.
Q. You don't have the slightest clue, do you?
A. No, sir.
Q. Was my client on blood thinners that night?
A. I don't know, sir.
Q. You don't have the slightest clue, do you?
A. No, sir.
Q. You didn't ask any medical history before you stuck her or she was stuck with that needle, did you?
A. The jailers have a full medical history that they ask them while they're booked into jail.
. . . .
Q. So you had a medical history on her before you took the blood?
A. That's correct.
Q. Did you review that?
A. No, sir.
Q. So what good would it have done?
A. I'm not sure.
. . . .
Q. . . . You didn't know anything about her medically, did you?
A. No, sir.

Officer Stinson testified that he did not know whether appellee's arm bruised; he did not check on her later that night.

According to Officer Stinson, he was a qualified technician as a result of having gone through Dr. Del Principe's program. Of the minimum of fifty sticks, or venipunctures, he did at the hospital, only one or two of them were under the doctor's direct supervision. According to Officer Stinson, the officers were not given "any specific protocol" on what to do if a suspect was fighting a blood draw, just "restrain using the least amount of force possible." They were never taught to take a suspect to the hospital if that suspect was fighting them. They did, however, have a protocol for going to the hospital if an officer was accidentally stuck with a needle.

**Officer Burkhart's Testimony**

At the time of trial, Officer Burkhart was working as a firefighter in the City of Pantego. He had been a firefighter for sixteen years and had six and a half years of police training. At the time he drew appellee's blood, he was working as a police officer for Dalworthington Gardens. At the time of the suppression hearing, he was classified as an EMT-Intermediate, which meant he was allowed to "start IVs, intubate patients, give certain drugs and provide basic life support." In addition to working as a firefighter, he worked part-time on an ambulance.

When asked how many blood draws he had performed as an EMT, Officer Burkhart responded, "Thousands." He had also done "many" venipunctures in

18

a hospital setting.  He had taken over 1600 hours of classroom work for his EMT training.  He estimated that at least forty of those hours related to "the use of needles and . . . blood draws, venipunctures, [and] IVs."  The training by Dr. Del Principe was in addition to his EMT training.  He described Dr. Del Principe's course as follows:

> It was how to properly obtain blood using venipuncture with extremities only, which is the upper extremities from your shoulder down to your fingertips.  The proper way of cleaning the site, proper way of inserting the needle, proper way of withdrawing the blood, and what you do after the blood's done, how you - - if there's any bleeding, what you do to stop the bleeding.

The course was similar to his EMT training in that they both taught anatomy of the arm and gave homework, including the on-site hospital training.  Officer Burkhart testified that Dr. Del Principe was familiar with him and his ability to perform "invasive medical procedures" on patients before he went through the course and that he had brought around fifty to one hundred patients to Dr. Del Principe after having performed such a procedure.  Because of his prior training, he was exempt from having to do the fifty hospital sticks that the other officers had to do.  What Dr. Del Principe's course taught him matched the techniques he learned in his EMT courses.

Officer Burkhart testified that he also had additional training through continuing education courses that a different doctor would conduct:  "Our

19

doctor - - our medical director comes out and we have skill sessions where we have to do certain skills in front of him." According to Officer Burkhart, neither that doctor nor Dr. Del Principe had ever had a problem with his training and experience in venipunctures.

Officer Burkhart confirmed that he cleaned the blood draw room before drawing appellee's blood. The officers showed appellee the warrant and explained what they were going to do. He confirmed they had to secure her to the chair. According to Officer Burkhart, appellee said, "[D]o whatever you have to do." He described the procedure for drawing the blood as follows:

> Once we determine a site, we apply a tourniquet. We look for the area where we're going to draw the blood from a vein. Once the area is located, you use Betadine because you cannot use alcohol. We clean the site with Betadine. From there we take a needle with a tube holder and a tube, and we inject the needle into the - - or I'm sorry. Place the needle into a vein. We fill up an evidence tube or vacuum tube, to withdraw the blood. Once the tube's filled up, we take the needle out, the tube out. We mix the tube so that - - there's an anti-coagulant powder that's in there - - the blood doesn't clump together, twist - - however you want to say - - stir or twist the tube so the powder gets into the blood so it doesn't clot. Release the tourniquet, and then if there's any bleeding, hold her at - - pressure until the bleeding is stopped and then place a Band-aid on it.

He stuck her right wrist because it was a good vein, which he had learned from both experience and training.

20

According to Officer Burkhart, in taking appellee's blood, he did not deviate from what he had been taught; he followed the list of guidelines given to him. He and Officer Stinson also did the same kinds of things that would be done at a hospital to eliminate any unjustified risk to appellee. He explained,

> Well, first, when we restrained her, we restrained her to protect her from hurting herself or ourselves. Once she calmed down and we were able to draw the blood, I drew it correctly without, you know, jabbing the needle in, doing anything that's going to harm her. I did it by what is technically correct and a safe way of drawing blood from her.

Officer Burkhart admitted he did not know whether appellee was on blood thinners, whether she had had a mastectomy with a lymph node removal, or any other medical condition that could have affected her health. He admitted that knowing those things could have been important at the time of the blood draw because she "possibly" could have had a condition that might have affected her health. Officer Burkhart did not check appellee's arm for bruising, nor did he know if anyone else checked on appellee after the blood draw.

The State asked Officer Burkhart if, as an EMT, he asks for a medical history before doing a venipuncture; he said it depends on the situation. When asked if he saw any evidence of internal bleeding after taking appellee's blood, he responded, "No," explaining that

> [t]here was just a little bit of bleeding coming out of the vein. If you blow a vein, it's obvious. It swells up, bruises quickly. And if

21

I had been concerned, which is the same thing, you just direct pressure and ice pack. There was just a little bleeding coming out of where the needle site was.

**Dr. Del Principe's Testimony**

Dr. Del Principe is a doctor of osteopathic medicine; at the time of the suppression hearing, he was a full-time emergency room doctor at Arlington Memorial Hospital and had worked in emergency room care for approximately twenty-two or twenty-three years. He was the chairman of the hospital's Department of Emergency Medicine, president of the group that contracted to run the hospital's emergency room, and Medical Services Director for Dalworthington Gardens. He had personally performed thousands of blood draws. Apart from the officers he supervised in the training program, he had trained a "few hundred" others to draw blood over the course of his career, including student nurses, doctors, interns, and residents.

Dr. Del Principe prepared the Dalworthington Gardens program for training officers to draw blood after meeting with a person who runs a phlebotomy school in Phoenix, Arizona and who had prepared a similar program.[7] He got that person's curriculum and adapted it to the program he was developing, adding "some things that [he] thought [were] necessary to be able to train

---

[7] Dr. Del Principe admitted that no one had reviewed his program to determine if it was in accordance with accepted medical practices.

22

anyone to do venipunctures to draw blood." According to Dr. Del Principe, there are three sections to the course: homework reading material with a standard phlebotomy text and several articles on venipuncture, a fourteen-hour classroom course with tests, and fifty or more sticks[8] at the Arlington Memorial emergency room under the supervision of either Dr. Del Principe, one of the emergency room nurses, or a blood tech. He certified the officers based on the direct feedback he received on how they did their sticks. The State introduced into evidence the outline to the course. According to Dr. Del Principe, the manner in which the officers were trained and practiced was in accordance with accepted medical practices. In addition to training the officers, he would also oversee and talk to them on a regular basis to make sure they were not having problems.[9]

According to Dr. Del Principe,

> [P]hlebotomist really entails a lot of things. They do more than drawing blood. They will collect various samples, whether it's urine, stool, [or] blood samples. They do cultures, they run tests on blood samples, so they do a lot more than just drawing blood.

---

[8] According to Dr. Del Principe, the sticks were required only for those who had not done sticks before.

[9] Dr. Del Principe had also established a two-year recertification course consisting of a one-day class and additional sticks at the hospital if the officer had not done "a number of sticks" since being initially trained.

That's why in hospitals you'll see they have people that just -- they have just blood techs that just draw blood. They don't do the testing, but the phlebotomists have a more - - I'd say more advanced degree. They have more training in terms of handling blood samples; transferring blood samples, for example, the culture mediums to run specific tests on blood samples, so they have more advanced knowledge than a blood tech will.

A blood tech would just actually draw blood on behalf of the phlebotomist, and the phlebotomist would then process in the variety of ways whatever tests need to be run.

Dr. Del Principe described the people at Arlington Memorial who were blood techs as

paramedics, firefighters that are paramedics. We have one individual that basically out of high school . . . was trained by the hospital to draw blood and has been there for a number of years. He does not have a phlebotomy degree, but he's a, you know, blood draw tech they call him. I'm sure they have different names for them, but he basically trained, you know, by somebody showing [him] how to do that and then doing so many, and then he was certified to as a qualified technician in the hospital.

According to Dr. Del Principe, he trained the officers to be "qualified technicians," which is a different standard of training than what a phlebotomist would receive because of a phlebotomist's additional duties other than drawing blood.[10] Dr. Del Principe testified that the officers he trained had the same or similar training as those working for the hospital as blood draw techs and that

---

[10] The officers' training is limited to venous rather than arterial samples.

24

with their training, the officers could work as hospital blood techs.[11] He stated that if any of the officers had a problem drawing blood, they could call him to come to the station and draw the blood or take the suspect to the hospital.

Dr. Del Principe testified as to Officer Burkhart's training, stating that he was exempt from the hospital sticks because of his extensive prior experience in drawing blood. He had not seen Officer Burkhart start an IV or draw blood, but he had been in the emergency room forty or fifty times when Officer Burkhart brought in a patient he had started an IV for, and "he had no particular problems with that." He thought Officer Burkhart was "exceptional" at venipuncture and that he would be the equivalent of a blood tech at the hospital.

Dr. Del Principe testified that the blood draw room was designated as such because it had a concrete floor that could be painted and cleaned easily if there were a blood spill. It also had a stainless steel table and phlebotomy chair that could be wiped down and sanitized easily. The chair allows the patient to lie down in a more relaxed position and makes it easier for the person drawing blood to obtain a specimen. Dr. Del Principe chose the chair because it is best for the patient.

_____

[11] He admitted on cross that he did not know if they would actually be eligible for hire in that capacity at any of the local hospitals.

The State also introduced the "Clean Room Checklist" the officers were supposed to use when drawing blood; the copy in the record is signed by both Officer Stinson and Officer Burkhart. According to Dr. Del Principe, the checklist

> systematically allows an officer to go through each of these steps to make sure they are completing everything that needs to be completed.
>
> You know, there's always a number of things that need to be done, and this assures that we are following strict guidelines, strict procedures, *in not only the interview*, but what's - - what supplies you need to get out and in what order, what you need to do as far as bringing the subject into the room.  [Emphasis added.]

Although Dr. Del Principe testified that the officers ask everyone coming in for a blood draw if they have any medical problems generally, because he trained them to do so, he admitted that the question is not listed in the blood draw checklist.[12] He stated that a more detailed questioning process was not needed in the checklist because the officers are trained to ask if a suspect has "any particular medical problems any time they're arrested."  However, he also stated that *he was not aware* whether a medical history is taken when a suspect's blood is drawn at a hospital.

---

[12] In addition, he admitted the officers are not trained to ask more specific questions, such as whether a suspect has diabetes or is taking high blood pressure medication or blood thinners.

According to Dr. Del Principe, the Dalworthington Gardens program minimizes any unjustified risk of pain or infection for a person whose blood is drawn for suspected DWI because the blood draw occurs in a clean room, the "patient" is lying down, the officers know how to talk to the "patients" and calm them down, the "patients" are more relaxed because there are not a lot of people walking around and looking at them, and there were less sick, and therefore possibly less contagious, people than in a hospital.

Under cross-examination, Dr. Del Principe admitted that he and the department had not decided on a process to be followed if someone were fighting the officers and that if the officers were unable to get blood drawn safely, they would take the suspect to the emergency room where that person would be secured to obtain the blood. Dr. Del Principe nevertheless felt that the officers who had received training from him would be qualified to take blood from someone who was resisting and fighting. He said that in the twenty-four years he had been practicing, he had sometimes had to hold down persons whose blood was being drawn for law enforcement. When blood draws are taken in the hospital, the officers typically help the hospital staff secure the person whose blood is being drawn. Dr. Del Principe admitted there are inherent medical risks to drawing blood. He also stated that the only protocol for accidental needle sticks was to go to the hospital.

27

**Reasonableness Under Totality of Circumstances**

The trial court found that the seizure of appellee's blood "violated the Fourth Amendment's reasonableness requirement by not being taken *by medical personnel in a hospital or medical environment*." [Emphasis added.] However, most cases interpreting *Schmerber* do not read it so narrowly as to restrict the location of a blood draw to a hospital or clinic only. Draws taken in jails and sheriff's offices have been upheld as reasonable.[13] Here, there was extensive

---

[13] *See State v. May*, 112 P.3d 39, 41–42 (Ariz. Ct. App. 2005) (holding blood test taken at rear of police vehicle by sheriff's department phlebotomist reasonable); *Moore v. State*, 915 S.W.2d 284, 290–91 (Ark. 1996) (upholding blood draw performed by physician, in private, at sheriff's office because, "[a]s blood is routinely drawn by nurses, technicians, and other non-physicians, frequently in non-medical facilities, appellant was not in this instance subjected to an 'unjustified element of personal risk and pain'"); *People v. Mari*, 528 P.2d 917, 918 (Colo. 1974) (holding blood draw valid under Fourth Amendment when taken by medical technologist at sheriff's office); *State v. Cardona*, No. CRIM. A. IN08-05-1015–18, 2008 WL 5206771, at *1–2, 8 (Del. Super. Dec. 3, 2008) (mem. op.) (upholding draw by contract phlebotomist at Wilmington Police Department); *Davis*, 207 P.3d at 286 (upholding blood draw taken in kitchen area behind sheriff's dispatch office); *State v. Sickler*, 488 N.W.2d 70, 73–74 (S.D. 1992) (holding blood draw reasonable under *Schmerber* when performed at county jail by deputy sheriff who was also a licensed practical nurse); *State v. Mason*, No. 02C-01-9310-CC-00233, 1996 WL 111200, at *9 (Tenn. Crim. App. Mar. 14, 1996) (not designated for publication) (concluding that blood draw need not be taken in "hospital environment" to be reasonable if performed by qualified person, in conformity with procedures established by department of health and without threatening the health or safety of the accused); *State v. Daggett*, 2001 WI App. 32, ¶¶ 7–17, 250 Wis. 2d 112, 115–20, 640 N.W.2d 546, 548–51 (holding that location of blood draw—county jail booking room—was not unreasonable under Fourth Amendment), *review denied*, 2002 WI 23, 250 Wis.

28

testimony that the trial court found to be credible as to the "clean" and appropriate nature of the room in which the blood draw was taken. Accordingly, we conclude that the location of the draw was not inherently unreasonable under the Fourth Amendment or *Schmerber* simply by virtue of it occurring in the clean room at the police station as opposed to a "medical environment."

We are more troubled by other circumstances surrounding the blood draw. Although Dr. Del Principe testified that the officers should have asked for at least a general medical history because he had trained them to do so, both officers Stinson and Burkhart testified that they failed to make even a minimal inquiry as to appellee's health or medical condition.[14] In fact, such a

---

2d 559, 643 N.W.2d 96; *see also People v. Esayian*, 5 Cal. Rptr. 3d 542, 545–46, 549–50 (Cal. Ct. App. 2003) (upholding blood draw performed at detention facility by phlebotomoist even though phlebotomist was unqualified under state statute and noting that *Schmerber* "did not attempt to set any specific rules for blood tests conducted outside the hospital setting"); *cf. Garcia v. State*, 112 S.W.3d 839, 848–49 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (holding that Harris County jail was "sanitary place" under section 724.017).

[14] For purposes of this analysis, we will presume, based on Officer Burkhart's extensive history in drawing blood and employing venipuncture generally as an EMT, that he was qualified to draw appellee's blood for purposes of obtaining a specimen as directed by the municipal judge's warrant, and under the Fourth Amendment and *Schmerber*, regardless of the trial court's conclusion of law number 13, which as we have previously stated is inapplicable in that it is based on the alternative means for a reasonable blood draw set forth in the implied consent statute.

29

question was not even listed on the blood draw checklist. Although Dr. Del Principe testified that he was unsure whether a medical history is taken when a suspect's blood is drawn at a hospital, he obviously thought that such a question was important enough to train the officers to ask it. And he testified specifically as to the importance of following strict guidelines and procedures, not only in cleaning the room, but also in performing an "interview" prior to the blood draw. *Cf. People v. Mateljan*, 28 Cal. Rptr. 3d 506, 509, 512–13 (Cal. Ct. App. 2005, review denied), *cert. denied*, 546 U.S. 1171 (2006) (affirming trial court's denial of motion to suppress blood draws by statutorily-unqualified phlebotomists who were otherwise experienced in taking blood when testimony was directly conflicting as to whether the taking of a prior medical history was necessary). Thus, the trial court could have concluded that, under the totality of the circumstances—and based on Dr. Del Principe's credible testimony—the lack of prior questioning of appellee about her general medical history, combined with the officers' failure to follow up on her condition, subjected appellee to an unjustified risk of medical harm,[15] thus making the

---

[15] Although Officer Stinson testified that the jailers always take a medical history, there is no evidence in this record (a) of appellee's medical history or (b) that any of the jailers had medical training that would enable them to recognize a condition serious enough to warrant communicating that information to the officer prior to a blood draw or to provide follow-up care or recognize a subsequent medical emergency after a blood draw.

blood draw unreasonable under the Fourth Amendment as illustrated by the example set forth in *Schmerber*.

This lack of at least a prior rudimentary inquiry into appellee's medical and/or general health condition and lack of at least a cursory follow-up becomes even more troubling when considered in light of the other circumstances surrounding this blood draw, i.e., it was taken in the privacy of the police station without a video recording, even though one was available; alone with two officers, including the arresting officer; restraint was necessary; and the department did not have any guidelines for the use of force in such a situation.[16] Accordingly, we conclude and hold, albeit for slightly different

_____

[16] Because appellee has conceded that the warrant was valid and based upon probable cause, we are not presented with the equally troubling issue of the constitutionality—or wisdom—of a program that divests the officer of any discretion in determining what type of specimen to obtain from a suspect, especially considering Dr. Del Principe's admission that there are inherent risks in drawing blood, and the officers' and Dr. Del Principe's admissions that different medical conditions can impact whether a blood draw is advisable medically. *See* Tex. Transp. Code Ann. § 724.012(c) (giving officer discretion in asking for specimen of breath or blood); *Coggins v. State*, 160 S.W.3d 177, 179 (Tex. App.—Texarkana 2005, no pet.) (same). Moreover, under *Schmerber* the officer is required to consider what method of obtaining evidence of a suspect's blood-alcohol concentration is reasonable under the circumstances. 384 U.S. at 771, 86 S. Ct. at 1836. The officer should thus consider the particular circumstances as well as the suspect's willingness to perform other, less intrusive means, e.g., a breathalyzer or urinalysis. *See id*. When appellee refused the blood draw, she was not asked (nor did she offer) to take a less intrusive test, nor did she raise any of the concerns warned of in *Schmerber*; instead, she said only that she would have to ask her lawyer about

31

reasons than those specifically articulated by the trial court in its twelfth conclusion of law, that this blood draw was not reasonable under the Fourth Amendment and the guidance of *Schmerber*.

We caution, as did the Supreme Court in *Schmerber*, that our decision, as in other Fourth Amendment reasonableness cases, is based "only on the facts of the present record." *See Schmerber*, 384 U.S. at 772, 86 S. Ct. at 1836. We do not intimate that the inclusion of a rudimentary question about appellee's medical health or a brief follow-up on her condition after the blood draw is all that would have been required to make this blood draw reasonable, nor should our opinion be read to put a stamp of approval or disapproval on the Dalworthington Gardens blood draw program in general. We simply hold that, here, under the totality of the circumstances presented, the trial court did not err by granting appellee's motion to suppress. We overrule the State's contention that the search was executed reasonably under the Fourth Amendment.

---

it. *See id*. ("[F]or most people, the procedure involves virtually no risk, trauma, or pain. Petitioner is not one of the few who on grounds of fear, concern for health, or religious scruple might prefer some other means of testing, such as the 'Breathalyzer' test petitioner refused . . . . We need not decide whether such wishes would have to be respected.").

**Applicability of Good Faith Exception**

In its second point, the State contends that, regardless of whether the blood extraction was reasonable under the Fourth Amendment, the trial court should nevertheless have denied the motion to suppress because the officers obtained appellee's blood in good faith reliance upon the warrant. Article 38.23(a) of the code of criminal procedure excludes evidence obtained in violation of any provision of "the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America" except evidence obtained "in objective good faith reliance upon a warrant issued by a neutral magistrate based upon probable cause." Tex. Code Crim. Proc. Ann. art. 38.23(a)–(b) (Vernon 2005); *Dunn v. State*, 951 S.W.2d 478, 479 (Tex. Crim. App. 1997).

Because the State did not urge denial of the motion to suppress on this ground in the trial court, however, it failed to preserve the issue for appellate review. *State v. Mercado*, 972 S.W.2d 75, 78 (Tex. Crim. App. 1998); *State v. Ballman*, 157 S.W.3d 65, 71 (Tex. App.—Fort Worth 2004, pet. ref'd). We may not reverse a trial court's suppression order on unpreserved grounds. *Mercado*, 972 S.W.2d at 77; *Ballman*, 157 S.W.3d at 71. Moreover, it is doubtful whether article 38.23(b) governs the admissibility of evidence obtained pursuant to an otherwise valid warrant, but according to an unreasonable

33

procedure, i.e., whether it applies absent a technical defect in the process of obtaining a warrant. *See United States v. Leon*, 468 U.S. 897, 916, 104 S. Ct. 3405, 3417 (1984) ("[T]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates."); *State v. Tipton*, 941 S.W.2d 152, 155–56 (Tex. App.—Corpus Christi 1996, pet. ref'd) (reversing trial court's order suppressing evidence because police failed to provide defendant with copy of affidavit referenced in warrant). We overrule the State's second point.

## Conclusion

Having determined that the method of performing the blood draw in this case was unreasonable under the Fourth Amendment, and in doing so, having overruled the State's dispositive points, we affirm the trial court's suppression order.

TERRIE LIVINGSTON
JUSTICE

PANEL:  LIVINGSTON, MCCOY, and MEIER, JJ.

PUBLISH

DELIVERED:  November 5, 2009

34